**DENVER PETROLEUM CORPORA-
TION, a corporation, Denver,
Colorado**

and

Basin Pipeline, Inc., a corporation,
Denver, Colorado, Plaintiffs,

v.

**SHELL OIL COMPANY, a corporation,**
Denver, Colorado, Defendant.

**Civ. A. 66–C–650.**

United States District Court
D. Colorado.

Aug. 14, 1969.

Jones & Bastian, by Tilford A. Jones, Washington, D. C., McKean & Whitehead, by David J. McKean, Washington, D. C., and John J. Gaudio, Denver, Colo., for plaintiffs.

Boesche, McDermott & Eskridge, by Richard B. McDermott and Donald E. Hammer, Tulsa, Okl., and John D. Lawyer and Joseph C. Spalding, Denver, Colo., for defendant.

## MEMORANDUM OPINION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARRAJ, Chief Judge.

This action is to recover treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, for defendant's alleged violation of section 2 of the Sherman Act, 15 U.S.C. § 2. The matter has been tried to the Court, proposed findings have been submitted by the parties and legal questions have been extensively briefed and argued. We begin with a summary of the basic claims of the contestants.

While plaintiffs initially complained of a monopoly in the purchase, transport and sale of crude oil and condensate in a certain area, evidence and arguments presented at trial have narrowed the claim to the charge that defendant has attempted to monopolize and has monopolized the purchase of those materials in the particular area. The alternative geographic areas of monopolization proposed by plaintiffs are 1) the "Basin-Rio Arriba oil production area," 2) Rio Arriba County, 3) McKinley, Sandoval and Rio Arriba Counties, or 4) McKinley, Sandoval, Rio Arriba and San Juan Counties, of the state of New Mexico. Plaintiffs do not claim that defendant initially created the monopoly situation. Rather, their contention is that defendant acquired a monopoly by purchase of certain properties in Northwest

New Mexico and then actively maintained and enhanced the unlawful position originated by its predecessor in the area.

The means used to maintain and nurture the alleged monopoly is defendant's operation as a private carrier of the Northwest New Mexico crude oil pipeline system it acquired. Plaintiffs contend that defendant refused to transport oil other than its own on these lines and wrongly and intentionally failed to operate them as common carriers in violation of section 28 of the Mineral Leasing Act, 30 U.S.C. § 185, and the right of way grants issued thereunder. As a result of this operation, plaintiffs urge, defendant was able to control prices and exclude competition in the area and did so to plaintiffs' injury.

Consequently, plaintiff Denver Petroleum Corporation seeks to recover lost potential profits due to its alleged preclusion from engaging in the business of purchase and resale of crude oil and condensate in the Basin-Rio Arriba oil production area of Northwest New Mexico. Plaintiff Basin Pipeline, Inc., a wholly owned subsidiary of Denver Petroleum, seeks to recover for diminution of the value of its pipeline in Rio Arriba County allegedly caused by defendant's monopoly.

Defendant's basic positions, other than that plaintiffs have simply failed to prove their case in certain particulars, are that in the first place it just does not possess monopoly power in a relevant market. While denying the power to control prices or exclude competition in any area, defendant submits that the charge of monopoly must be tested in terms of the nationwide market in crude oil and condensate. Alternatively, the Four Corners area of Utah, Colorado, Arizona and New Mexico or this Four Corners area plus California are advanced as being the relevant market for analysis of monopoly power. In this connection, defendant suggests that if the relevant market be confined to

Northwest New Mexico or some particular subdivision thereof as contended by plaintiffs, the interstate commerce element falls out of the case precluding application of the federal antitrust laws.

Regarding the economic situation in Northwest New Mexico, defendant urges that competition is vigorous and that prices show no sign of monopoly power, any variations in pricing being the result of supply and demand.

As to its Northwest New Mexico crude oil pipeline system, defendant advances contentions directed toward the conclusion that all obligations under both state and federal law have been fulfilled and that the manner of operation of these lines was in no way wrongful: 1) The obligation imposed by section 28 of the Mineral Leasing Act is discharged by operation as either a common carrier or a common purchaser. Defendant acted as a common purchaser thus fulfilling this duty as well as complying with the New Mexico common purchaser statute. 2) The pipeline system is an intrastate gathering system and thus need not, and did not, operate as a common carrier. 3) Any common carrier obligation regarding plaintiffs never accrued since plaintiffs never tendered any oil for transport and did not invoke available and required administrative processes.

Defendant's final contentions concern standing to recover treble damages and the question of damages. Defendant urges that plaintiff Denver Petroleum had no business or property within the meaning of the antitrust laws in the area in which to be injured and accordingly lacks standing to recover treble damages for any antitrust violation there might be. Plaintiff Basin Pipeline's claim to recover for injury to property is challenged under the rule against indirect injury requiring that only the party first and directly injured may recover treble damages. Defendant further questions the causation of any injuries as well as attacking the damage claims as to amount and speculativeness.

Having heard and considered all the evidence, the Court renders the following findings and conclusions:

## I. FINDINGS OF FACT

1. Defendant Shell Oil Company (hereinafter referred to as Shell) is a Delaware corporation, with principal offices in New York, New York, which transacts business and is found in the District of Colorado. Shell is an integrated oil company engaged in the production of crude oil and gas, the purchase of those materials, their transportation, the refining of crude oil and gas and the marketing of resultant products. Included within its area of operations is Northwest New Mexico where, since March 9, 1964, it has owned a refinery and certain pipelines for the transportation of crude oil and condensate.

2. Plaintiff Denver Petroleum Corporation (hereinafter referred to as DPC) is a Wyoming corporation incorporated in February of 1961. Originally formed under the name of Mountain Crude Marketers, Inc., its name was changed to Denver Petroleum Corporation on October 15, 1964. Its business was the purchase of crude oil from producers and other intermediates and its resale. DPC engaged in this business primarily in Montana and Wyoming with some activity in Colorado until approximately mid-1964. In April of 1963 DPC acquired Basin Pipeline, Inc., by stock purchase and thereafter commenced certain efforts toward establishing itself as a buyer and seller of crude oil and condensate in the area of the Basin Pipeline in Rio Arriba County, New Mexico. Since shortly after its formation, DPC has been in poor financial condition and from September 24, 1964 has been operating under a chapter XI bankruptcy arrangement in this Court, No. 38824, under its previous name. All operations of DPC ceased on August 1, 1966.

3. Basin Pipeline, Inc., (hereinafter referred to as Basin) has been a wholly owned subsidiary of DPC since April of 1963. It is a New Mexico corporation formed to construct and operate the Basin Pipeline in Rio Arriba County, New Mexico, which was completed in 1961. That line was virtually its sole asset and its only business was the transportation of crude oil and condensate through the line. Basin too has had a poor financial history, having sustained a net operating loss in every year of operation, and all activities ceased on August 1, 1966 with the forced sale of the Basin Pipeline in the DPC chapter XI bankruptcy proceeding.

4. With the exception of crude oil purchasing in the Bisti Field, Shell was not active in Northwest New Mexico prior to March 9, 1964. On that date Shell entered the area on a large scale with the acquisition of certain properties from El Paso Natural Gas Products Company and on April 1, 1964 Shell took over operation of these properties. Included in the purchase was the Ciniza Refinery located in McKinley County, New Mexico, and a crude oil pipeline system, a primary function of which is to supply the refinery with crude oil and condensate.

5. The components of this Northwest New Mexico crude oil pipeline system which are relevant to this case are as follows:

a. The Pettigrew-Apache-Lybrook-Hospah line (known as the Hospah-Pettigrew line) is a four inch pipe located in Rio Arriba, Sandoval and McKinley Counties.

b. The Bloomfield-Bisti-Ciniza line (known as the Bloomfield-Ciniza line) is a six inch line approximately 98 miles long located in McKinley and San Juan Counties. While Shell purchased only a segment of this line adjacent to the Ciniza Refinery, it holds the remainder of the line under a lease from El Paso Natural Gas Products Company and operates the entire Bloomfield-Ciniza line.

c. The Jicarilla Crossover, a six inch line, runs for approximately 39 miles in Rio Arriba and San Juan Counties connecting the Hospah-Pettigrew line at Apache Junction with the Bloomfield-Ciniza line.

d. The Bisti-Four Corners delivery line is a short section of pipe connecting Bisti Station on the Bloomfield-Ciniza line with the Four Corners Pipeline.

6. The flow of oil in these lines is as follows: Oil entering the Hospah-Pettigrew line at Pettigrew Station flows in a general southerly direction to Apache Junction, while oil entering that line at Hospah or Lybrook Stations flows in a general northerly direction to the same point. At Apache Junction, that oil, as well as other oil entering the system there, enters the Jicarilla Crossover and flows to the Bloomfield-Ciniza line. The flow in the Bloomfield-Ciniza line is in a general southerly direction. Oil entering this line at Bloomfield Station or from the Jicarilla Crossover flows to Bisti Station where it may either continue on down the Bloomfield-Ciniza line to the Ciniza Refinery or be delivered into the Four Corners Pipeline through the Bisti-Four Corners delivery line for shipment to California.

7. The Four Corners Pipeline, owned by the Four Corners Pipeline Company, is a common carrier of crude oil with tariffs on file with the Interstate Commerce Commission. It carries crude from various points in Southeast Utah and Northwest New Mexico, one of them being the Bisti area, to the Los Angeles area of California. At all times relevant to this suit there was available capacity in the line for such carriage.

8. Shell's Jicarilla Crossover, the Bloomfield-Ciniza line and the Bisti-Four Corners delivery line form a workable means for shipment of crude oil and condensate from Apache Junction in Rio Arriba County to the Four Corners Pipeline in the Bisti area for delivery to California. This pipeline route is the only existing long-term economically feasible means for such transportation since distance and terrain make trucking generally unprofitable and at times impossible due to the effects of weather. While a primary function of the Northwest New Mexico crude oil pipeline system is to supply the Ciniza refinery,

Shell also does use it to send substantial quantities of crude oil and condensate produced in the area of the lines to California via the Four Corners Pipeline.

9. The Hospah-Pettigrew line, the Jicarilla Crossover, the Bloomfield-Ciniza line and the Bisti-Four Corners delivery line cross public lands of the United States.

10. The original right of way grants concerning the lines enumerated in number 9 above contain stipulations to the effect that the pipelines will be operated as common carriers in accordance with the Mineral Leasing Act.

11. The assignments to Shell of the rights of way for the lines enumerated in number 9 above state that Shell agrees to perform and observe all obligations under the grants.

12. In applications submitted to the Bureau of Land Management for approval of the assignments of rights of way for the lines enumerated in number 9 above, Shell stated that it agreed to comply with all terms and conditions of the grants.

13. Shell knew of the common carrier obligation of the Mineral Leasing Act and knew that these lines were subject to the provisions of that Act.

14. Shell did not operate the lines enumerated in number 9 above as common carriers. Shell determined to continue operation of them as private carriers with the idea of transferring them to Shell Pipeline Corporation for operation as common carriers in the event of a complaint. The lines were operated as private carriers, transporting only crude oil and condensate owned by Shell and refusing to transport such materials for others. The Shell Northwest New Mexico crude oil pipeline system never carried oil belonging to anyone other than Shell at any time relevant to this suit and was not held out as being a common carrier.

15. On October 20, 1964, October 21, 1964 and on a subsequent unspecified date approximately two weeks later, Shell, through Mr. J. K. Moore, refused

to transport crude oil and condensate for DPC from Apache Junction to Bisti through the Jicarilla Crossover and the Bloomfield-Ciniza line. Mr. John N. Backus, president of DPC and Basin, then having a contract for the purchase of crude oil and condensate from Consolidated Oil & Gas, Inc., dated October 15, 1964 and having prospective purchasers in California, requested such transportation on each of those three dates. Each time such transportation was refused on the ground that the pipelines were private carriers.

16. The Basin Pipeline, then owned by Basin Pipeline, Inc., consists of approximately 40 miles of two, three and four inch pipe located in the southwestern part of Rio Arriba County, New Mexico. The central point on the line is at Apache Junction and oil in both branches of the line flows to that point. Oil can and regularly does flow from the Basin Pipeline into Shell's Jicarilla Crossover at Apache Junction. Since Shell's entry into the area all oil entering the Basin line has belonged to Shell and has been delivered into the Jicarilla Crossover. Under a contract effective May 1, 1964, Basin performed this transportation for 20½ cents per barrel. For the same transportation Basin previously received 15½ cents per barrel from El Paso Natural Gas Products Company.

17. The product, or more properly the material, involved in this case is crude oil. In using this term hereinafter we also mean to include condensate. Both are liquid hydrocarbons and while condensate is generally of a higher API gravity rating than crude oil, the determining factor in distinguishing between them is their source. Condensate is a by-product of natural gas wells and, obviously, crude oil comes from oil wells. In Northwest New Mexico, crude oil and condensate of the same gravity rating are generally similar in composition.

18. The relevant geographic market for purposes of this case is Rio Arriba County, New Mexico, and particularly the Basin-Rio Arriba oil production area included therein. The Basin-Rio Arriba Oil production area may generally be defined as encompassing the producing wells within the broad vicinity of the Basin Pipeline. The area we have found to be the relevant market is where DPC contends that it intended and was able to become a purchaser and seller of crude. This is part of the area which Shell sought to appropriate to itself and isolate from out of state competition. Distance, terrain and weather make large-scale trucking from the area uneconomical, especially since, due to weather, trucking is most difficult during the months of highest production. Without a pipeline available for use by all, this fact tends to separate this particular area from the rest of the region. Further, the business of initial purchase from the producer is largely conducted on a local level. Producers generally sell to those operating in their area and do not generally cast about the country looking for purchasers.

19. The purchase of crude oil in Rio Arriba County, as well as in the smaller included Basin-Rio Arriba oil production area, is an activity affecting interstate commerce. With but insignificant exceptions, all crude oil and condensate produced in Northwest New Mexico is consumed in the four refineries located there or shipped to California via the Four Corners Pipeline. The products of Shell's Ciniza Refinery are regularly sold in interstate commerce. While the percentage cannot be determined, oil produced in Rio Arriba County is frequently transported to California by Shell. Crude oil produced in Rio Arriba County supplants or substitutes for other crude produced elsewhere in Northwest New Mexico used as part of the supply for the Ciniza Refinery and thus frees such other crude for shipment in interstate commerce through the Four Corners Pipeline to California. Additionally, an appreciable part of that commerce is affected; Rio Arriba County produces in the neighborhood of one

and one-half to two million barrels of oil per year with a dollar value running into the millions.

■ 20. Shell's monopolization of the purchase of crude oil in the area by operation of its Northwest New Mexico crude oil pipeline system as a private carrier restrained interstate trade. Its effect was to prevent area supply from escaping to the West Coast in interstate commerce and in refusing to transport for DPC in October of 1964 a potential interstate transaction was actually prevented.

■ 21. Shell possessed monopoly power in Rio Arriba County, including the Basin-Rio Arriba Oil production area, New Mexico.

22. In Rio Arriba County, Shell purchased the following percentages of total production:

| | 1964 | 1965 | 1966 | Average |
|---|---|---|---|---|
| First purchase | 65.74% | 67.38% | 67.48% | 66.92% |
| Second purchase | 7.53 | 10.42 | 5.68 | 7.90 |
| Total | 73.27 | 77.80 | 73.16 | 74.82 |

(Note: 1964 percentages include March to December only.) Throughout Northwest New Mexico, thus including Rio Arriba County, Shell purchases, ultimately, almost all crude produced not refined by the three other local refiners. As to Rio Arriba County, Shell's percentage of total production purchased is actually higher than that given above for at least some periods due to purchases outside Rio Arriba County of crude produced in that county.

23. Shell had the power to exclude competition from Rio Arriba County due to its operation of lines of the Northwest New Mexico crude oil pipeline system, particularly the Jicarilla Crossover, as private carriers. In view of the transportation difficulties in the area, such exclusion was the natural and foreseeable consequence of such operation.

24. Shell had no meaningful competition in Rio Arriba County. Despite the presence of demand for Four Corners area crude on the West Coast, no West Coast refiners, except Shell, or intermediates supplying such refiners, purchased in the Rio Arriba area. West Coast refiners were active in the Bisti area where the proximity of the common carrier Four Corners Pipeline gave equal access to production. Ultimately, the only competition faced by Shell in Rio Arriba County was that presented by the three other Northwest New Mexico refiners—Plateau, Caribou Four Corners and Frontier Beeline. This competition was not meaningful because of the small capacity of these refineries and the fact that they desired high gravity condensate for their operation, a material for which Shell had no particular desire. Shell took the position that these refineries would get their supply no matter what. Additionally, numerous intermediates were active in the area. However, their business largely was supplying the three local refineries, and accordingly they operated, in that area, within the same limitations as those refineries, as well as Shell. The activities of the local refiners and intermediates centered on production not connected to pipelines. Intermediates delivered the bulk of such production to receiving points on Shell's lines. Shell did not intend to, and did not, exclude competition in this particular aspect of the trade in Rio Arriba County, and indeed could not have done so by the device of operation of its lines as private carriers.

■ 25. By reason of the lack and exclusion of meaningful competition, Shell was able to maintain prices in Rio Arriba County at an artificially low level. In comparison with the Bisti area,

where there was competition by reason of the proximity of the Common carrier Four Corners Pipeline, prices in Rio Arriba County were depressed. This depression of prices was the result of three practices which had the effect of reducing the price received in Rio Arriba County: 1) The imposition of excessive location differentials. In Rio Arriba County Shell deducted from the price it paid for crude a location differential in excess of the cost, including provision for return on capital, of the pipeline transportation which such deduction was supposed to cover. 2) The prevention of commingling. In Rio Arriba County Shell was largely able to prevent commingling, a process by which one could mix crude of light and heavy gravities to obtain a mixture of medium gravity crude commanding the highest price. Commingling of oil was common in the industry and Shell did purchase commingled oil at Bisti where other competitors would accept it if Shell did not. 3) Extension of gravity deduction beyond 55 degrees. Crude oil of 40 to 44.9 degrees gravity brought the highest price under Shell's Northwest New Mexico posting and for each degree of gravity above or below that range a deduction of 2 cents per barrel was made. At Bisti this deduction stopped at 55 degrees while in Rio Arriba County the deduction did not so terminate. Such continuation of the gravity deduction was not common in the oil industry. Each of these three practices resulted in savings to Shell and effectively reduced the price paid for crude oil in Rio Arriba County. While none of these practices are wrongful, the ability to impose them and effect reductions in price is indicative of monopoly power.

26. Shell posted the only price in Northwest New Mexico. This posting had a substantial influence on the price paid by other purchasers.

27. Shell needed the supply from Rio Arriba County for the Ciniza Refinery and its California operations and on occasion was short of supply for both areas. Shell's purpose in failing and refusing to transport oil for others on its Northwest New Mexico crude oil pipeline system was to protect this supply and to preserve it for Shell's own use.

28. Shell's monopoly in Rio Arriba County was not complete and that aspect of the trade concerning the supply of Shell and the three other local refiners from production not connected to pipelines was not restrained. Producers and sellers of crude were free to discontinue sales to Shell at any time and on occasion did so and found other buyers. Many companies engaged in this aspect of the trade and were able to sustain profitable operations. Shell had neither the existing means nor the desire to eliminate the competitive situation in this aspect of the trade.

29. In late March of 1964 Shell did not refuse to provide pipeline transportation for DPC and indeed was not requested to provide such transportation at that time.

30. Shell never refused to purchase crude oil from DPC.

31. Shell never interfered with or restrained in any way the business of Basin Pipeline, Inc.

32. Upon Shell's refusal to provide transportation from Apache Junction to Bisti on its pipelines in October of 1964, plaintiff DPC and plaintiff Basin did not seek relief in any form before any administrative office or agency and have not yet done so to this date.

33. During 1963, well before Shell's entry into the area in March and April of 1964, DPC took certain steps with a view toward becoming a purchaser and seller of crude oil in the Basin-Rio Arriba oil production area of Rio Arriba County. In April of 1963 DPC contracted to acquire Basin Pipeline, Inc., which owned the Basin Pipeline, with hopes of using that line in becoming active in purchase and resale in that area. Before and for a few months after that date, DPC contacted various producers and looked for prospective purchasers of crude which it might acquire. Some ex-

pressed interest and some did not and no contracts or firm commitments were made. In that period DPC also contacted El Paso Natural Gas Products Company regarding the possibility of transportation on the Northwest New Mexico crude oil pipeline system, which El Paso then owned and was refused.

34. At all times since March 9, 1964, DPC has had no business or property within the area of monopolization in which to be injured. Since that date DPC has not been a viable business entity competent to enter successfully in the business of purchase and resale of crude oil in Rio Arriba County, the Basin-Rio Arriba oil production area located therein, or any other area, including the areas in which it had formerly competed and failed.

35. Since March 9, 1964, DPC took no sufficiently substantial affirmative actions toward entry into the business of purchase and resale of crude oil in the area of monopolization. After the matters noted in number 33 above, no efforts toward entry were made until late March of the following year when DPC asked Shell to step aside as purchaser along the Basin line and to allow DPC to take over these purchases. Shell refused. Inasmuch as it is the producer who determines to whom his oil shall be sold and Shell was under utterly no obligation whatever to make such a turnover, this "effort" is of no significance.

36. With the exception of a few subsequent contacts with small producers and a 93 barrel purchase, the only effort toward entry into the business and DPC's only actual crude oil transaction in the area was the purchase of crude from Consolidated Oil & Gas, Inc. In October of 1964 DPC obtained a contract to purchase certain of Consolidated's production from wells within the vicinity of the Basin Pipeline but not connected to it by outbidding the previous buyer, Inland Crude, Inc., by approximately 20 cents per barrel, DPC's price being a flat $2.31 per barrel regardless of gravity. The contract was for one year, to continue thereafter month to

month but then terminable on thirty days notice by either party. It was contemplated that 300 to 400 barrels per day would be involved but in fact only approximately 150 barrels per day were purchased. DPC further found West Coast purchasers who said they would be willing to purchase the production. DPC, as stated in number 15 above, requested that Shell allow transportation over their lines from Apache to Bisti and was refused. Thereafter, it was arranged for Shell to purchase the Consolidated production from DPC on the basis of the posted price. Shell, because of DPC's financial condition, insisted that Consolidated agree to hold Shell harmless in the event of nonpayment by DPC and upon Consolidated's refusal a three party agreement was made whereby Shell directly paid Consolidated the amount due it and paid DPC any excess of the posted price over that amount. Because DPC was losing money so badly on the deal, Consolidated offered a 10 cent per barrel rebate effective in February of 1965 and DPC accepted it. At the end of September 1965 both Consolidated and DPC canceled the contract, the notices crossing in the mail. There is no evidence that Consolidated's cancellation was due in any way to Shell.

37. The Consolidated transaction was an affirmative effort toward entry into the business in the area. However, it was the only such significant action in the entire relevant time period.

38. From the time of Shell's entry into the area DPC was insolvent and without credit or other resources to satisfy even existing obligations or operating necessities for continuance of its existing business in Wyoming, Montana and Colorado and was financially incapable of entering the business of purchase and resale of crude oil in Rio Arriba County, New Mexico.

39. In every year of operation except its first (1961), DPC incurred substantial and increasing losses. Beginning in August of 1963 DPC became delinquent in its crude oil accounts and in March of 1964 was subject to numerous suits and

garnishments by producers who had not been paid for crude purchased by DPC and by those who had provided services to DPC. Numerous others who were owed for crude did not file suit. The most immediate cause of the initial delinquencies in crude payment was the use of funds which should have been allocated to that purpose for the purchase of Basin Pipeline, Inc. Matters were not helped any when, in January of 1964, DPC purchased a quantity of Wyoming crude and immediately resold it at a lower price resulting in a loss of between nine and ten thousand dollars. DPC's financial predicament culminated in the filing of a petition for a chapter XI bankruptcy arrangement in this Court on June 15, 1964 and on September 24, 1964 an arrangement was approved by the creditors and the Court. As of December 31, 1964, the first date after commencement of the chapter XI proceeding for which a balance sheet is available, DPC's financial situation under the arrangement was as follows: current assets of $152,930.72; current liabilities of $5,089.72; and a balance of $147,841.00. Of this balance, $68,292.00 was available for use by the company.

40. There is no credible evidence that DPC would have been able to secure additional financing. While there has been much said about the use of letters of credit, there is no evidence that DPC could have obtained such. DPC had previously failed to make payment on a transaction for which its bank had issued a letter of credit, leaving the bank to make payment under the letter.

41. Neither Shell nor any act or thing done by Shell was the cause of DPC's financial collapse.

42. After coming under the shelter of the chapter XI bankruptcy arrangement, DPC's only substantial effort toward becoming active in the purchase and resale of crude was the Consolidated transaction. No efforts whatever were made toward reestablishment in its former areas of operation in Montana, Wyoming and Colorado. Nor was any effort made toward becoming active in that part of the crude oil trade in Rio Arriba County concerning the supply of local refiners. This aspect of the trade was in no way restrained by Shell and numerous companies successfully engaged and competed in it.

43. The principals of DPC and Basin, John N. Backus and Hart Gleason, were men of long experience in the crude oil business with numerous contacts in the industry. Despite these credentials, the company compiled extensive losses in operations in other areas in no way due to Shell or its activities.

44. Producers of crude oil consider three basic factors in determining to whom they will sell their production: 1) price, 2) credit and ability to pay, and 3) service. The element of credit and ability to pay is critical since it is essential not only that payment be made but that it be made on time.

45. In obtaining crude purchase contracts a reputation for prompt payment is vital and DPC could not have possessed such reputation. In dealing with purchasers unknown to them, producers of crude typically investigate the background of such companies. It is not reasonably probable that DPC would have been able to purchase and resell crude oil in substantial quantities in Rio Arriba County or any other area.

46. DPC had merely the hope or expectation of engaging successfully in the business of purchase and resale of crude oil in Rio Arriba County. While at times having the intention to do so, DPC was wholly lacking in preparedness and capacity for such an endeavor and made but one substantial affirmative effort in that direction.

47. Basin Pipeline, Inc., never engaged in the business of purchase and resale of crude oil and never intended to so engage, either before or at any time after Shell's entry into Northwest New Mexico. Basin's only business was the transportation of crude oil on its pipeline and Shell did nothing to interfere with or restrain that business.

**300**

48. Throughout its years in operation, the Basin Pipeline did suffer a marked decline in value. Basin suffered a net operating loss in every year of operation and never paid an income tax. In December of 1963 BCO, Inc., disconnected its wells from the Basin line and refused to reconnect. This resulted in the loss of greater than thirty percent of the Basin lines throughout and greater than thirty percent of its gross revenue. Neither this disconnection nor the decline in value of the Basin line is attributable to Shell or any of its acts.

49. Any injury which Basin could have suffered by reason of any restraint or restriction upon the business of purchase of crude oil in the area in which its pipeline was located would have been indirect, secondary and remote, and no more than a reflection of injury first done to its customer-shippers of crude oil.

50. In proof of the monetary amount of damages sustained by reason of lost potential profits, plaintiffs have presented a hypothetical profit calculation (plaintiffs' exhibits 599 and 600). This calculation attempts to determine the amount of profit that would have been derived by DPC's purchase and resale of all the crude oil and condensate within the area of the Basin Pipeline from April of 1964 to complete exhaustion of all reserves. This calculation is premised on numerous assumptions which are unwarranted by the evidence. Among them are the following: 1) The calculation assumes that by the device of a 5 or 10 cent per barrel increase in the price of crude DPC would be able to purchase all the production in the area. The evidence shows that any such increase in price would be immediately met and there would be no appreciable dislocation of existing buyer-seller relations. 2) The calculation assumes that DPC had the financial capability to engage in these transactions as well as to construct numerous pipeline extensions to unconnected wells. The evidence is to the contrary. 3) The calculation assumes that DPC would completely displace Shell, the

other local refiners and the intermediates operating in the area. This assumption has no basis in fact and is wholly unreasonable.

## II. CONCLUSIONS OF LAW

1. Under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1337, the Court has jurisdiction of the subject matter of the claims presented in the complaint, as amended, and of the parties.

2. The plaintiffs have the burden of proof with respect to all elements of their complaint necessary to give rise to relief under section 4 of the Clayton Act, 15 U.S.C. § 15, for injuries sustained in consequence of violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

3. Defendant Shell Oil Company has violated section 28 of the Mineral Leasing Act, 30 U.S.C. § 185, by failing to operate lines of its Northwest New Mexico crude oil pipeline system, particularly the Hospah-Pettigrew line, the Bloomfield-Ciniza line, the Jicarilla Crossover and the Bisti-Four Corners delivery line, as common carriers in that it has not held out these lines as being available to transport for others and has, when requested, refused to provide transportation for others.

4. Defendant Shell Oil Company by the means of operation of lines of its Northwest New Mexico crude oil pipeline system as private carriers has attempted to monopolize and has monopolized the purchase of crude oil and condensate in the relevant market, that being Rio Arriba County, New Mexico, and has done so knowingly and willfully, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and did have the power to exclude competition and control price.

5. Plaintiff Denver Petroleum Corporation, formerly Mountain Crude Marketers, Inc., has no standing to sue under section 4 of the Clayton Act, 15 U.S.C. § 15, in that it had no business or property within the meaning of the antitrust laws in the area of mo-

nopolization in which to be injured. While section 4 does not limit standing to fully functioning existing businesses, it does require that there be real preparedness and capability to engage in the business and substantial efforts in that direction. Because of its past experience, its financial condition and the limited nature of its efforts toward engagement, DPC does not measure up to this standard.

6. Plaintiff Basin Pipeline, Inc., in fact sustained no direct injury to business or property by reason of anything done by defendant in violation of the antitrust laws, and insofar as it would have been injured by defendant's monopolization of the purchase of crude oil and condensate in Rio Arriba County, any such injury would have been indirect and derivative and thus beyond the coverage of section 4 of the Clayton Act, 15 U.S.C. § 15.

 7. Plaintiffs, in seeking to recover lost potential profits, have failed to present evidence from which the amount of such damage could justly and reasonably be determined. On the basis of the evidence here, no judgment as to the amount of damages from lost potential profits could be entered that was not the product of mere speculation and guesswork.

8. Plaintiff Denver Petroleum Corporation should take nothing upon its complaint, as amended, against the defendant Shell Oil Company.

9. Plaintiff Basin Pipeline, Inc., should take nothing upon its complaint, as amended, against the defendant Shell Oil Company.

10. The several claims of the plaintiffs should be dismissed upon the merits, and the defendant Shell Oil Company should have and recover its costs.

## III. DISCUSSION

While we do not mean to cover all the issues of the case, in the course of disposition certain questions have been presented which merit further discussion beyond the findings and conclusions. These problems have arisen under each of the three basic elements of the private antitrust claim—violation of the antitrust laws, injury to business or property as a result of such violation, and the monetary amount of such injury.

### A. Violation of the Antitrust Laws

 Plaintiffs have charged an attempt to monopolize and monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. And we have concluded that such a violation has been established and that defendant Shell did indeed possess monopoly power in the purchase of crude oil in a certain area of Northwest New Mexico. It should at the outset be noted that though this case involves a monopoly of purchasing, there is no dispute that such a monopoly is as equally prohibited by the antitrust laws as is the more typical monopoly of sales. *See* Montrose Lumber Co. v. United States, 124 F.2d 573 (10th Cir. 1941). Monopolization in violation of section 2 consists of the possession of monopoly power, that being the power to control prices or exclude competition, in a relevant market and the willful acquisition or maintenance of that power. United States v. Grinnel Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L. Ed.2d 778 (1966).

No more need be said regarding the control of prices or exclusion of competition or the element of deliberateness. We begin with a critical aspect of this element of the case—Shell's operation of lines on its Northwest New Mexico crude oil pipeline system as private carriers. Section 28 of the Mineral Leasing Act, 30 U.S.C. § 185, provides in pertinent part as follows:

> Rights-of-way through the public lands, including the forest reserves of the United States, may be granted by the Secretary of the Interior for pipe-line purposes for the transportation of oil or natural gas * * * upon the express condition that such pipe lines shall be constructed, operated, and maintained as common car-

riers and shall accept, convey, transport, or purchase without discrimination, oil or natural gas produced from Government lands in the vicinity of the pipe line in such proportionate amounts as the Secretary of the Interior may, after full hearing with due notice thereof to the interested parties and a proper finding of facts, determine to be reasonable \* \* \*. Failure to comply with the provisions of this section or the regulations and conditions prescribed by the Secretary of the Interior shall be ground for forfeiture of the grant by the United States district court for the district in which the property, or some part thereof, is located in an appropriate proceeding. Accordingly, under the facts, it has been our conclusion that the section was violated.

■ However, defendant has advanced certain arguments toward a contrary conclusion. The first such contention is that under section 28 it is the pipeline owner's option to operate as a common carrier or a common purchaser and that Shell did perform this latter obligation. While there is no indication that Shell did not act as a common purchaser, indeed one might say that what plaintiffs complain of is defendant's overzealous performance in this regard, we reject the legal premise of the argument. As we read the statute, the common carrier obligation is absolute and independent of the common purchaser provision. It is most significant that as originally enacted, the relevant portion of section 28 simply stated, "upon the express condition that such pipe lines shall be constructed, operated, and maintained as common carriers \* \* \*." 41 Stat. 449 (1920). The *common purchaser* provision did not come into law until the 1935 amendment which added the words regarding the duty to accept, convey, transport or purchase oil produced from Government lands in the vicinity of the pipeline. 49 Stat. 678–79 (1935). There is no indication that the addition of this common purchaser requirement

was intended to modify or limit the absolute common carrier obligation of the original enactment. *See* In re Richfield Oil Corp., 68 Interior Dec. 435 (1961).

■ Defendant's second contention is that its Northwest New Mexico crude oil pipeline system is an intrastate gathering system not subject to the common carrier obligation. Regardless of whether the lines are exempt from regulation under state law as a gathering system, there is little to be said concerning the contention. Assuming for present purposes that these lines could qualify as a gathering system, the provisions of section 28 of the Mineral Leasing Act authorize no such exemption and there is no support for it in federal statutory or decisional law.

■ Defendant's final contentions center on the notion that no common carrier obligation ever matured as to plaintiffs due to their failure to make a formal tender of oil for transport and to seek any administrative relief. Taking the former point first, we do not regard the absence of a formal tender of oil as critical. The repeated requests and refusals of October of 1964, when DPC did have a crude purchase contract, make it clear that the policy of operation of the lines as private carriers was in full force and effect in general and as to DPC. This is as close to a formal tender as one can get without requiring the absurdity of trucking oil to the line while knowing full well that transportation will be refused. *Cf.* Houston, E. & W. T. Ry. v. Campbell, 91 Tex. 551, 45 S.W. 2, 43 L.R.A. 225 (1898).

■ The failure to seek administrative relief raises a considerably more difficult problem. Our conclusion is that *no administrative action is necessary to perfect the common carrier obligation.* The statute flatly states that lines "shall" be operated as common carriers. "A pipe line that receives a grant is subject to the common-carrier provisions from the date of the grant." Mondakota Gas Co. v. FPC, 98 U.S.App.D.C. 101, 232 F.2d 358, 362, *cert. denied,* 352

U.S. 846, 77 S.Ct. 45, 1 L.Ed.2d 51 (1956). The obligation is absolute, exists from the date of the grant, and no administrative action is necessary to ripen the obligation. Defendant's invocation of the doctrine of primary jurisdiction is, we feel, inappropriate. No administrative office or agency is empowered to exempt crude oil pipelines from the provisions of section 28 of the Mineral Leasing Act. Further, no administrative remedy for violation of the section is provided. The only express remedy for violation, forfeiture of the grant, is left in the hands of the courts.

However, defendant points out the necessity of administrative determination on matters of rate and the proportionate amount of plaintiffs' oil to be carried. To be sure, in some circumstances such determinations might be necessary to perfect a particular transportation. But the simple facts here are that defendant never allowed the matter to get to the point of rates and there never was, nor has there been as yet, a suggestion of lack of line capacity. Shell's refusal to transport was premised solely on the lines' asserted status as private carriers.

■ Moreover, beyond the question of a violation of the section by refusal to transport for the present plaintiffs, we believe that the evidence shows violation of the common carrier obligation in another sense. The obligation of the section is that the lines shall "be constructed, operated, and maintained as common carriers * * *." At the very least, to agree to operate as a common carrier is to assume the obligation of making one's self available to transport for others. Numerous cases have defined the term "common carrier" and its essence is a holding out to the public as a transporter for hire. See 13 Am. Jur.2d Carriers § 2 (1964); 13 C.J.S. Carriers § 3 (1939), and cases cited therein. There is no reason to suppose that when Congress used the words in section 28 it intended them to have any other meaning. See Chapman v. El Paso Natural Gas Co., 92 U.S.App.D.C. 154, 204 F.2d 46, 51 (1953) (stating that section 28 embraces the common law meaning of the words "common carrier"). It is clear that Shell did not and never has held these lines out as being available for transportation for others.

We recognize that other decisions have in somewhat similar circumstances dismissed cases alleging, among other things, antitrust violations through refusals to transport on lines subject to the common carrier requirement of section 28 of the Mineral Leasing Act because of failure to secure certain administrative determinations. Interstate Natural Gas Co. v. Southern Calif. Gas Co., 209 F.2d 380 (9th Cir. 1953); McClellan v. Montana-Dakota Util. Co., 104 F.Supp. 46 (D.Minn.1952, aff'd on other grounds, 204 F.2d 166 (8th Cir. 1953), cert. denied, 346 U.S. 825, 74 S. Ct. 43, 98 L.Ed. 350 (1953); see also Mondakota Gas Co. v. Montana-Dakota Util. Co., 103 F.Supp. 666 (D.Mont. 1951), appeal dismissed, 194 F.2d 705 (9th Cir.), cert. denied, 344 U.S. 827, 73 S.Ct. 28, 97 L.Ed. 643 (1952). These cases dealt with natural gas pipelines and thus were concerned with the Natural Gas Act, 15 U.S.C. §§ 717 et seq., which gives the Federal Power Commission extensive power over all aspects of the interstate transportation and sale of natural gas. (The problems of accommodating section 28 of the Mineral Leasing Act with the role of the FPC under the Natural Gas Act led to a 1953 amendment to section 28 exempting certain regulated natural gas pipelines from the common carrier obligation.) Because of the involvement of the FPC and the Natural Gas Act, the three cited decisions concern situations far different from that presented here. No federal agency has comparable powers regarding the transportation and sale of crude oil. While the Interstate Commerce Commission does have regulatory authority over crude oil lines engaged in interstate commerce, 49 U.S.C. § 1(1), they are by no means as pervasive as the powers of the FPC over natural gas pipelines. Additionally, the authority of the Secretary of the Interior as to crude

oil pipelines is of but limited extent. While New Mexico regulation is of an extensive character, it can have no effect as to compliance with the federal leasing act.

This ground of distinction does not completely dispose of the *McClellan* and *Mondakota Gas Company* cases since a basis for dismissal in each of those decisions was the plaintiff's failure to secure a determination by the Secretary of the Interior as to the proportionate amount of its gas to be carried by defendants. In this case the proportionate amount provision does not come into play because the suit is founded on the common carrier obligation rather than on the separate duty to transport or purchase oil produced from Government lands to which the proportionate amount provision is attached.

However, to the extent that any of these three gas pipeline cases may be inconsistent with our approach here, we simply are of the opinion that they should not be followed. In sum, our conclusion is that when there is an absolute and flat refusal to transport on lines subject to the common carrier obligation of section 28, a plaintiff need not go through the administrative process to work out the details of nonexistent transportation as a prerequisite to an antitrust suit where there is no administrative agency empowered to enforce compliance with the common carrier obligation of the Mineral Leasing Act or to exempt a pipeline owner from its provisions. That the section leaves the only express remedy for violation in the hands of the courts makes it clear that the determination of a violation is regarded as being within the judicial competence.

The next matter for consideration is the problem of the so-called "relevant market". Our conclusion has been that for purposes of this case the relevant geographic area is Rio Arriba County, New Mexico, and particularly what has been called the Basin-Rio Arriba oil production area included therein. While it is likely that defendant's monopoly power extends as far as its illegal operation of the pipelines as private carriers is effective to isolate the crude supply, there is no real need to expand consideration to the other areas of Northwest New Mexico. Plaintiffs would have us believe that they proposed to operate in the Basin-Rio Arriba oil production area; if there is not a monopoly there it matters not in this case that there might be monopoly power in other areas, and if there is, as we have found, a monopoly in that area, it similarly makes no difference, under our approach, that the monopoly may encompass a larger area.

Defendant would have us engage in market analysis, considering the full breadth of "economic and competitive realities," to determine that the market structure is, if not nationwide, at least as broad as the entire Four Corners region. And there is no doubt whatever that Shell does not possess a monopoly of purchasing in any of these larger areas considered as a whole.

■ However, in our opinion, such analysis is unnecessary in this case and the "relevant market" is in that sense irrelevant. We have here a practice illegal in itself, operation of the pipelines as private carriers, a purpose and the obvious natural effect of which was to exclude nonlocal competition from the crude supply which Shell badly needed. When one must "look" for a monopoly, determining a relevant market in which to look and in which to evaluate competitive effects is obviously an essential first step. But when, with an illegal practice such as is present here in mind, one can look at an area and see the existence of monopoly power, not by inference from market share, but by determining actual ability to exclude competition and control prices, there appears no real need to go further.

Especially significant in this regard is the decision in United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). There the Court in a section 7, 15 U.S.C. § 18, acquisition case was faced with a lower

court dismissal on the ground of failure to prove the relevant market. In reversing, the Court stated as follows:

> Apparently the District Court thought that in order to show a violation of § 7 it was essential for the Government to show a "relevant geographic market" in the same way the corpus delicti must be proved to establish a crime. But when the Government brings an action under § 7 it must, according to the language of the statute, prove no more than that there has been a merger between two corporations engaged in commerce and that the effect of the merger may be substantially to lessen competition or tend to create a monopoly in any line of commerce *"in any section of the country."* (Emphasis supplied.) The language of this section requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States—"in *any* section" of the United States. This phrase does not call for the delineation of a "section of the country" by metes and bounds as a surveyor would lay off a plot of ground. The Government may introduce evidence which shows that as a result of a merger competition may be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country. In either event a violation of § 7 would be proved. Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant "economic" or "geographic" market is not an adequate ground on which to dismiss a § 7 case. Compare *United States* v. *Continental Can Co.,* 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953. Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States. 384 U.S. at 549–550, 86 S.Ct. at 1667–1668 (footnote omitted).

While section 7 uses the phrase "any section of the country," section 2 refers to "any part of the trade or commerce among the several States * * *." The purchase of crude in Rio Arriba County and the Basin-Rio Arriba oil production area is a part of that commerce.

Having found monopoly power in this particular small area, to adopt defendant's geographic market theory would be to in effect excuse monopolies which adversely affect only a segment of the total competitive arena. Such could not be justified in the face of the Sherman Act's injunction against monopolization of "any part" of the trade or commerce. The words of the Third Circuit in *William Goldman Theatres, Inc.* v. *Loew's, Inc.,* 150 F.2d 738, 744 (3d Cir. 1945), are pertinent:

> We reject the argument that, at most, if monopoly existed or exists it is limited to the downtown theatre district of Philadelphia and it amounts to a partial control of the business of exhibiting motion pictures in a limited area. True, Warner Brothers operate only a small part of the total number of theatres within the municipal boundaries of Philadelphia and its environs. But, Warner Brothers own or control all of the theatres where first-run pictures are exhibited in the centralized theatre district of Philadelphia. We are unaware of a rule of limitation, dependent upon operation in space, which permits an illegal monopoly and restraint of trade. The statutory prohibition is against any course of conduct which monopolizes "any part" of interstate trade. We know of no authority which sanctions what would otherwise be an illegal

monopoly simply because it operates in a single city or a particular part of a city and affects only a part of an industry involved. There is no such limitation on the effect of the antitrust laws. (Footnotes and citations omitted.)

Numerous other decisions have found antitrust violations where only a small geographic area and merely a part of a much larger industry were affected. *See, e. g.,* Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356 (1934); Gamco, Inc. v. Providence Fruit & Produce Bldg., 194 F.2d 484 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952); White Bear Theatre Corp. v. State Theatre Corp., 129 F.2d 600 (8th Cir. 1942); Peto v. Howell, 101 F.2d 353 (7th Cir. 1938).

Moreover, looking at the particular circumstances of this case, there are factors demonstrating the appropriateness of the area we have chosen. The difficulties of truck transportation tend to isolate this particular area and Shell's operation of its pipelines as private carriers solidified this isolation. In this regard, it can be said that the scope of the illegal practice is relevant in defining the market area to be considered. Further, an important factor in standard market analysis is the structure of buyer-seller relationships. If one is talking about the over-all business of purchase and resale of crude, no doubt the over-all market has a larger scope due to the vast network of pipelines and the medium of exchanges. But as this case has developed, the only concern is the purchase of crude, and, at least in Rio Arriba County, this activity is conducted on a much more localized basis. Producers of crude generally sell to those operating in their area and do not engage in extensive solicitations for sale of their production throughout the country. Finally, this is at least part of the area which Shell sought to appropriate to itself to the exclusion of out of state competition, and, as before noted, this is the area in which plaintiffs say they were going to operate. In our view, no more need be shown.

■ The final matter for consideration under this heading is the involvement of interstate commerce and whether the monopoly found here concerns a sufficiently appreciable part of that commerce. In addition to our findings we need only state that it is well established that local and purely intrastate activities come within the purview of the antitrust laws whenever there is a substantial effect on interstate commerce. This comprehends activities which come to bear before the actual interstate flow has begun. *See, e. g.,* Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). There can be no doubt of an effect on interstate commerce when, as in the case of the Consolidated transaction, defendant's wrongful refusal to transport amounted to a physical blocking of potential interstate trade. As to the amount of commerce which must be involved, we need only note the decision in United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). The Court there established that all that is necessary is that an appreciable part of the commerce be affected and that the percentage of business involved in comparison with the total of such business is not determinative.

## B. Injury to Business or Property

■ The gist of the private antitrust action is found in the requirement of direct injury to business or property. Section 4 of the Clayton Act provides for treble damage recovery by "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws * * *." 15 U.S.C. § 15. Proof of a violation of the antitrust laws alone entitles a plaintiff to nothing. Numerous cases have found against private antitrust plaintiffs, even though a monopoly did or might have existed, because the

element of direct injury to business or property was lacking.

### Denver Petroleum Corporation

We have concluded that DPC lacks standing under section 4 of the Clayton Act because it had no business or property in the area of monopolization in which to be injured. While not arguing that it possessed property in the area, as indeed it did not, DPC's position is that it had a sufficient business to satisfy the standing requirements in that it was precluded from entering the business of purchase and resale of crude in the Basin-Rio Arriba oil production area by defendant's wrongful acts at a time when it had the ability and intent to successfully engage in such activity. Though at times appearing to take the absolute view that section 4 requires an existing, fully functioning business and that those merely attempting to enter a business are beyond the coverage of the statute, it seems that the core of Shell's defense has been an attack on the ability and capacity of DPC to make such an entry.

■■■ Though concluding against plaintiff DPC, we reject the view that section 4 affords a remedy only to those having an actual going business. While there are decisions which appear to accept such an approach, *see* Duff v. Kansas City Star Co., 299 F.2d 320 (8th Cir. 1962); La Rouche v. United Shoe Mach. Corp., 166 F.Supp. 633 (D.Mass.1958), we concur in the following statement from Delaware Valley Marine Supply Co. v. American Tobacco Co., 184 F. Supp. 440, 443 (E.D.Pa.1960), *aff'd on other grounds*, 297 F.2d 199 (3d Cir. 1961), *cert. denied*, 369 U.S. 839, 82 S. Ct. 867, 7 L.Ed.2d 843 (1962):

> Defendant's argument necessarily presupposes that when Congress authorized treble damage suits it meant to distinguish between the rights of persons who are put out of business and the rights of persons who are kept out of business by a conspiracy. It is unreasonable to suppose that such a distinction was intended by Congress.

The purpose of the anti-trust laws is to promote competition and to prevent its restraint. This purpose is no less thwarted when a person who intends and is prepared to embark in trade is stopped at the outset, than it is when a going business is brought to a standstill. It is as unlawful to prevent a person from engaging in business as it is to drive him out of business. The restriction which defendants would place upon the meaning of the word "business" is unwarranted in the context of its Clayton Act usage. (Citation omitted.)

A succinct, and to this day accurate, statement of the law is found in American Banana Co. v. United Fruit Co., 166 F. 261, 264 (2d Cir. 1908), *aff'd on other grounds*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909):

> Now, in order to state a cause of action for damages under the statute, it is not necessary to aver an injury to an existing business. As stated by this court * * *, "it is as unlawful to prevent a person from engaging in business as it is to drive a person out of business." But it is necessary to state facts showing an intention and preparedness to engage in business. (Citations omitted.)

Numerous subsequent cases have followed these principles and particularly the requirement that there be an intention and a preparedness to enter the particular business activity. Martin v. Phillips Petroleum Co., 365 F.2d 629 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Triangle Conduit & Cable Co. v. National Elec. Prod. Corp., 152 F.2d 398 (3d Cir. 1945); Waldron v. British Petroleum Co., 231 F.Supp. 72 (S.D.N.Y.1964); Delaware Valley Marine Supply Co. v. American Tobacco Co., *supra*; Brownlee v. Malco Theatres Inc., 99 F.Supp. 312 (W.D. Ark.1951). Stating it another way, the

mere hope or expectation to enter a business is clearly insufficient. Peller v. International Boxing Club, Inc., 227 F.2d 593 (7th Cir. 1955); Image & Sound Serv. Corp. v. Altec Serv. Corp., 148 F.Supp. 237 (D.Mass.1956). Other cases, though not using the same precise phrase, have applied the same essential principle of intention and preparedness. Pessin v. Keeneland Assoc., 45 F.R.D. 10 (E.D.Ky.1968); Deterjet Corp. v. United Aircraft Corp., 211 F.Supp. 348 (D. Del.1962); William Goldman Theatres, Inc. v. Loew's, Inc., 69 F.Supp. 103 (E. D.Pa.1946), aff'd, 164 F.2d 1021 (3d Cir. 1948); Pastor v. American Telephone & Telegraph Co., 76 F.Supp. 781 (S.D.N.Y.1940). The standard remains the same whether the case be viewed as one of expansion of an existing business or establishment of a new enterprise. Martin v. Phillips Petroleum Co., *supra*, 365 F.2d at 633.

Applying the standard of intention and preparedness to this case, we have concluded that while DPC had, at certain times, intent to enter the business in the Rio Arriba area, it was wholly lacking in preparedness and ability to do so and had indeed ceased to be a viable business entity independent of Shell's Northwest New Mexico activities. In reaching this determination, we have carefully considered the precedents dealing with the problem of standing to sue under attempts to enter a business and from them derive certain factors for evaluation of the requisite intent and preparedness.

Among the relevant factors are the background and experience of the principals, including their previous successes or failures in the same or a related business as well as possession of the requisite skills and abilities. A major consideration is the financial capability of the enterprise, which encompasses the extent of investment and the ability to finance operations and to make necessary purchases. Also essential is the taking of substantial affirmative action toward entry; there must be actual and substantial efforts toward the intended end. This broad category obviously encompasses much, such as the consummation of relevant contracts and procurement of necessary facilities and equipment.

While these factors are certainly not all-inclusive, it is evident that intent, a real capability to engage in the business and the taking of substantial steps toward entry are essential. As we view the instant case, its facts simply do not measure up to this standard.

Before closing this particular section, it should be noted that we do not regard the actions toward entry taken by DPC in 1963 as entitled to consideration in this evaluation. Firstly, the time lapse between these and subsequent actions demonstrates to us an abandonment of efforts. Secondly, and more importantly, these 1963 activities took place well before Shell's entry into the area. It should further be noted that in Denver Petroleum Corp. v. El Paso Products Co., 67–C–361 (D.Colo. Nov. 28, 1967), it was held that DPC had no business in Northwest New Mexico prior to March 9, 1964 sufficient to accord standing under section 4 of the Clayton Act.

### Basin Pipeline, Inc.

While it is clear that Basin possessed property, namely the Basin Pipeline, within the area of monopolization, its claim founders upon another aspect of section 4 of the Clayton Act—the rule of direct injury. The evidence is clear that Basin was in no way directly injured by the activities of Shell and Shell in no way interfered with or restrained its business.

Accordingly, Basin's theory of recovery for diminution in the value of its pipeline is that since value depends upon generation of earnings, if DPC had been able to purchase and resell crude connected to the Basin line its value would have been much greater.

Assuming for the moment that DPC could have engaged in this activity and that it would have resulted in an increase in the value of the Basin line, Basin would still be entitled to recover nothing for it is hard to imagine a clearer instance of reflected injury. In effect, Basin says that its line would

have been worth more had not Shell precluded DPC from operating in the area, because then Basin would have been able to carry more oil.

It is well settled that despite its broad language § 4 of the Clayton Act does not give a private cause of action to a person whose losses result only from an interruption or diminution of profitable relationships with the party directly affected by alleged violations of the anti-trust laws. Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907, 909 (D.Mass.1956). This principle has been applied in numerous situations, *see, e.g.,* Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955); the most analogous of which to the instant case are those denying standing to a supplier who claims injury by diminution of business with his directly injured customers. *See* Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962); Snow Crest Beverages, Inc. v. Recipe Foods, Inc., *supra*. Both *Volasco* and *Snow Crest* also establish that this principle remains the same when supplier and customer are commonly owned corporations functioning in an integrated manner.

In 1967 the rule of direct injury was reaffirmed as the law of this Circuit in Nationwide Auto Appraiser Service, Inc. v. Association of Cas. & Surety Companies, 382 F.2d 925 (10th Cir. 1967). Noting the analogy to the supplier cases, the court held that a franchiser of automobile appraisal businesses did not have standing to recover for a restraint of trade which prevented the franchisees from operating and thus reduced the income to the franchiser.

To be sure, diminution in the value of property is a recoverable item of damages under the antitrust laws, but it too must accrue directly from the wrongdoing of the defendant.

### C. Damages

In closing, we wish to say a few words regarding the claim for recovery of lost potential profits, the amount of which is based on the hypothetical profit calculation of plaintiffs' exhibits 599 and 600. We have concluded that no judgment as to the amount of damages sustained by reason of lost profits could be entered upon the evidence presented.

While there is no need now to go into the specific deficiencies of the evidence in this regard, the applicable principles should be stated. The rule has long been established in antitrust cases that where the fact of damage caused by a defendant's wrong is established with certainty, the fact that such damage is uncertain as to amount is no obstacle to recovery and a just and reasonable estimate should be made. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952). But it is equally true that "the amount of damages may not be based upon mere speculation and conjecture." Kobe, Inc. v. Dempsey Pump Co., *supra*, at 426 (citing *Story Parchment*). Especially pertinent is the decision in Delaware Valley Marine Supply Co. v. American Tobacco Co., 184 F.Supp. 440 (E.D.Pa.1960). The court in that case was faced, as is the Court here, with the hypothetical profit calculation of a private antitrust plaintiff claiming standing under efforts to enter a business. After analyzing the profit calculation, in granting judgment for the defendant the court made the following statement in which we concur:

[D]espite judicial liberality in accepting minimal proof of damage in an anti-trust case, the rule persists that any damage estimate * * * must be "just and reasonable" and not based on "speculation or guesswork". No damage verdict could be rendered upon the evidence in the present case without doing violence to this inexorable requirement. 184 F.Supp. at 448 (citation omitted).

Judgment will be entered accordingly.