DELAWARE VALLEY MARINE SUP-
PLY COMPANY, Plaintiff,

v.

AMERICAN TOBACCO COMPANY et al.,
Defendants.

Civ. A. 22921.

United States District Court
E. D. Pennsylvania.
June 9, 1960.

Edwin P. Rome, Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., for plaintiff.

R. Sturgis Ingersoll, Philadelphia, Pa., for defendant American Tobacco Co.

H. Francis DeLone (of Barnes, Dechert, Price, Myers & Rhoads), Philadelphia, Pa., for defendant Philip Morris, Inc.

C. Brewster Rhoads, Montgomery, McCracken, Walker & Rhoads and Joseph W. Swain, Jr., Philadelphia, Pa., for defendant Liggett & Myers Tobacco Co.

J. B. H. Carter, Philadelphia, Pa., for defendant R. J. Reynolds Tobacco Co.

Robert W. Sayre and Joseph N. Ewing, Jr. (of Saul, Ewing, Remick & Saul), Philadelphia, Pa., for defendant P. Lorillard Co.

Jay H. Eiseman (of Barba & Eiseman), Philadelphia, Pa., for Lipschutz and others.

STEEL, District Judge.

Plaintiff seeks treble damages under Sec. 4 of the Clayton Act, 15 U.S.C.A. § 15, and an injunction under Sec. 7 of the Act, 15 U.S.C.A. § 26, because of alleged violations by defendants of Secs. 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. After denying motions by the defendants for directed verdicts at the close of the evidence, the Court, acting under F.R.Civ.P. 49(a), 28 U.S.C.A., submitted critical fact issues to the jury

upon special interrogatories.[1] The jury was unable to agree upon an answer to the first interrogatory, and was discharged. Defendants then filed the present motions for judgment under F.R.Civ. P. 50(b) in accordance with their earlier motions for directed verdicts.

Plaintiff was incorporated for the purpose of selling in bond cigarettes and other tobacco products to vessels bound for foreign countries from ports in the Philadelphia area. In bond sales to foreign-bound vessels are not subject to the federal taxes normally imposed upon domestic sales of tobacco products. The business of selling in bond merchandise to vessels is known as the sea stores business.

Five of the corporate defendants are major cigarette manufacturing companies. The sixth corporate defendant, Lipschutz Bros., Inc., is a distributor in the Philadelphia area of various types of sea stores, including tobacco products manufactured by the five major cigarette companies. Two individual defendants are members of the Lipschutz family who are either stockholders, directors or officers of Lipschutz Bros., Inc. Shortly before trial the defendant Albert Lipschutz died and his administrators were substituted as parties.

Plaintiff charges that the manufacturing defendants refused to sell it the cigarettes which it needed to engage in the sea stores tobacco business, and that

---

1. The interrogatories were:

"1. Did plaintiff have such business or property as to entitle it to maintain this action?

"_____
("yes" or "no")

"Note: If your answer is 'no', you need not answer any further questions. If your answer is 'yes', continue on.

"2. Did any two or more of the cigarette manufacturing defendants conspire among themselves to refuse to deal with the plaintiff?

"_____
("yes" or "no")

"Note: If your answer to Question 2 is 'no', you need not answer any further questions. If it is 'yes', continue on.

"3. If your answer to Question 2 is 'yes', specify, by means of a check, which of the following cigarette manufacturing defendants conspired among themselves to refuse to deal with the plaintiff:

American Tobacco _____
Liggett & Myers _____
P. Lorillard _____
Philip Morris _____
R. J. Reynolds _____

"4. If you find that a conspiracy existed between any two or more of the cigarette manufacturing defendants, did the following defendants knowingly participate in it?

Lipschutz Bros., Inc. _____
Albert Lipschutz _____
Morton Lipschutz _____
("yes" or "no")

"Note: Answer the following question only if you have found that P. Lorillard was a member of a conspiracy.

"5. Did plaintiff mail to P. Lorillard and P. Lorillard receive from plaintiff a letter requesting P. Lorillard to sell its products to the plaintiff?

"_____
("yes" or "no")

"Note: Answer the following question only if you have found that R. J. Reynolds was a member of a conspiracy.

"6. Did plaintiff mail to R. J. Reynolds and R. J. Reynolds receive from plaintiff a letter requesting R. J. Reynolds to sell its products to the plaintiff?

"_____
("yes" or "no")

"Note: If your answer to Question 2 is 'yes', continue on.

"7. Did the plaintiff sustain any financial loss between July 7, 1956 and July 15, 1957 as a result of the conspiracy?

"_____
("yes" or "no")

"Note: If your answer to Question 7 is 'no', you need not answer Question 8. If your answer to Question 7 is 'yes', you must give an answer to Question 8.

"8. What was the amount of the loss sustained by plaintiff during the period July 7, 1956, and July 15, 1957?

"$_____"

this refusal was the result of a conspiracy among the manufacturing defendants and Lipschutz Bros., Inc., which was designed to create and maintain for Lipschutz Bros., Inc., a monopoly in a substantial segment of interstate commerce. All of the defendants deny that there is any evidence from which the jury could properly find that plaintiff had a "business" or "property" required by Sec. 4 of the Clayton Act to qualify plaintiff to sue for treble damages, defendants' refusal to deal with plaintiff was conspiratorial, and plaintiff was damaged either in fact or in ascertainable amount. In addition, Reynolds and Lorillard deny that plaintiff requested them to sell tobacco products to it. The interrogatories submitted to the jury were directed to these issues. The Estate of Albert Lipschutz also asserts that the action abated upon his death.

On a motion for a directed verdict a case is not lightly to be taken from the jury since it is the recognized trier of the facts. The Court must accept as true all the facts favorable to the plaintiff which the evidence tends to prove and draw all reasonable inferences against the defendants. If the evidence is of such character that reasonable men in an impartial exercise of judgment might reach different conclusions, the case should be submitted to the jury. Makowsky v. Povlick, 3 Cir., 1959, 262 F.2d 13, 14–15. On the other hand, it is essential that, after making due allowance for all reasonable possible inferences favoring the plaintiff, mere speculation be not allowed to do duty for probative facts. Galloway v. United States, 1943, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458. These are the principles which must govern the disposition of defendants' motions.

### Standing to Sue for Treble Damages

Section 4 of the Clayton Act authorizes the recovery of treble damages by any person who is injured in his "business" or "property" by reason of anything forbidden by the anti-trust laws. Defendants contend that since plaintiff never actually engaged in business, it had no business within the intendment of Section 4. Defendant's argument necessarily presupposes that when Congress authorized treble damage suits it meant to distinguish between the rights of persons who are put out of business and the rights of persons who are kept out of business by a conspiracy. It is unreasonable to suppose that such a distinction was intended by Congress. The purpose of the anti-trust laws is to promote competition and to prevent its restraint. This purpose is no less thwarted when a person who intends and is prepared to embark in trade is stopped at the outset, than it is when a going business is brought to a standstill. It is as unlawful to prevent a person from engaging in business as it is to drive him out of business. Thomsen v. Union Castle Mail S. S. Co., 2 Cir., 1908, 166 F. 251, 253. The restriction which defendants would place upon the meaning of the word "business" is unwarranted in the context of its Clayton Act usage.

Triangle Conduit & Cable Co., Inc. v. National Electric Products Corp., 3 Cir., 1945, 152 F.2d 398 held that Section 4 of the Clayton Act did not require an injury to a specific going business and that if an intention and preparedness to engage in business was shown, this was enough to qualify one injured by an anti-trust violation to treble damage relief. Although the Court of Appeals affirmed the dismissal, it was solely because the proof failed to establish that the plaintiff intended and was prepared to engage in business. The opinion leaves no room for doubt that had an intention and preparedness to engage in business been proven, the Court would have held that the action was maintainable. Identical implications are to be drawn from Wm. Goldman Theatres, Inc. v. Loew's Inc., D.C.E.D.Pa.1946, 69 F.Supp. 103; affirmed 3 Cir., 1948, 164 F.2d 1021; certiorari denied 1948, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742. There, the plaintiff, which had been in the business of exhibiting second-run moving pictures, recovered treble damages because, as a

result of a conspiracy by the defendants, it was prevented from exhibiting first-run pictures in a theatre which had never opened. On a record which disclosed that plaintiff intended and was prepared to exhibit first-run pictures, the Court stated that there would be no logic or sound policy for adopting a rigid rule which would preclude the plaintiff from recovering loss of profits simply because it had no established *going business in first-run showings.*

It is unnecessary to review the decisions in other circuits since this Court's action is governed by the Triangle Conduit decision. It may be noted in passing, however, that statements in American Banana Co. v. United Fruit Co., 2 Cir., 1908, 166 F. 261, 264 and in Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., 2 Cir., 1908, 166 F. 254, 260 are consistent with the Triangle Conduit opinion.

 Since one who is prepared and intends to carry on a business is entitled to maintain a treble damage action when a conspiracy prevents him from doing so, the status of plaintiff to sue is clear. The record is replete with evidence which would support a finding that plaintiff was prepared and intended to enter the sea stores business and would have done so but for defendants' refusal to sell it cigarettes. Indeed, on the present motions defendants made no serious contention to the contrary but restricted their argument primarily to the proposition that because plaintiff never actually carried on any business it had no status to maintain a treble damage action.

Since ample evidence exists from which the jury could have found that plaintiff had a "business" within the meaning of Section 4, it is unnecessary to consider whether the plaintiff had "property" within the meaning of that Section.

### Damages

 Defendants assert that no evidence exists from which a jury could properly find that plaintiff sustained any damage from the alleged conspiracy. For purposes of the discussion which follows, it will be assumed that defendants did in fact conspire to keep plaintiff out of business.[2]

Story Parchment Co. v. Paterson Parchment Paper Company, 1931, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 seemingly affirmed the rule that although the fact of damage must be shown, without any element of uncertainty, to be definitely attributable to the wrong, a dollar value may be assigned to an injury even if some uncertainty exists as to its amount. Later cases, such as Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 are said to have clarified Story Parchment, and today, in this Circuit at least, there is the same liberality permitted in proving the fact of damages as exists in proving the amount of damages. Noerr Motor Freight v. Eastern Railroad Presidents Conference, D.C.E.D.Pa.1957, 155 F. Supp. 768, 834, affirmed 3 Cir., 1959, 273 F.2d 218. Nevertheless, there has never been any relaxation of the rule laid down in Bigelow v. RKO Radio Pictures, supra, 327 U.S. at page 264, 66 S.Ct. 574, that a jury is entitled to assess damages only if relevant data exists from which it can make a just and reasonable estimate, and it will not be permitted to render a verdict based on a guess simply because a defendant by its own wrong may have prevented a more precise computation. The fact that the amount of a plaintiff's damages cannot be expressed in exact figures does not necessarily make them speculative. Estimates which are as definite and certain as the subject matter admit are enough if there is a reasonable basis for the verdict. Rankin Co. v. Associated Bill Posters, 2 Cir., 1930, 42 F.2d 152, 155.

In three Supreme Court decisions jury verdicts were sustained in treble damage actions on the basis of evidence of prior business success of either the plaintiff or

---

2. Defendants deny that there was any evidence to support a finding of a conspira-cy. As to this the Court expresses no view one way or the other.

its predecessor. Eastman Kodak v. Southern Photo Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, Story Parchment Co. v. Paterson Parchment Paper Co., supra, and Bigelow v. RKO Radio Pictures, supra. But the absence of prior business history will not defeat a recovery if other satisfactory proof of damages is adduced. Wm. Goldman Theatres, Inc. v. Loew's, Inc., supra; Flintkote v. Lysfjord, 9 Cir., 1957, 246 F.2d 368, 392. In the Goldman case a judgment for treble damages was sustained upon proof of hypothetical profits which the plaintiff claimed it would have made if the conspiracy had not prevented its theatre from opening.

Since the plaintiff at bar had no business history upon which it could base an estimate of future earnings, it was of necessity compelled to rely upon a hypothetical profit theory. Plaintiff contends that there is ample evidence from which the jury could have found that plaintiff would have operated profitably and would have earned $68,650 during the damage period.[3] This figure is based upon the assumption that, but for the conspiracy, plaintiff would have made sales to (1) vessels in the Port of Philadelphia, (2) Piranian, a ship's chandler, and (3) Seafarers' Sea Chest Corporation, with resultant net profit computed as follows:

| | |
|---|---|
| (A) Sales to vessels in Port of Philadelphia (1750 vessels at $300 per vessel). | $525,000 |
| (B) Sales to Piranian, a ship's chandler | 10,000 |
| Gross sales | $535,000 |
| Profit ratio of 15% on gross sales | $ 80,250 |

| | |
|---|---|
| (C) Profit on sales to Seafarers' Sea Chest Corporation (9,000 cases at $2 per case). | 18,000 |
| Gross Profits | $ 98,250 |
| *Less* Expenses of doing business | 29,600 |
| Net Profit | $ 68,650 |

In ascertaining whether evidence exists from which the jury could reasonably or logically infer that plaintiff would have earned profits of $68,650, or, indeed, in any amount, two factors will be accepted as established: a profit ratio of 15% on gross sales is proper, and $29,600 fairly represents what plaintiff's operating expenses would have been.[4]

(A) *Sales of $525,000 to vessels in the Port of Philadelphia.* The amount of sales to vessels which plaintiff claims to have lost in the Port of Philadelphia is based upon the assumption that it could have obtained orders from each of 1,750 vessels averaging $300 per vessel.[5] During the damage period 5,211 vessels which were engaged in the foreign trade entered the Port of Philadelphia and the defendant Lipschutz sold cigarettes to 1,949 of these vessels. Plaintiff argues, first, that the remaining 3,262 vessels were potential customers of the plaintiff, and second, that the jury could properly have found that the plaintiff could have sold about 50% of these potential customers, or roughly 1,750 vessels.

To say that 3,262 vessels which Lipschutz did not sell represented potential customers which the plaintiff might have sold is true only in a theoretical sense. More than 50% of the vessels in the foreign service that stop in Philadelphia have already been to one or more other ports in the United States. In most in-

---

**3.** The parties have stipulated that the damage period is between July 7, 1956, the date of the first refusal of the defendants to sell plaintiff cigarettes, and July 15, 1957, the date when this action was begun.

**4.** Defendants challenge the validity of the expense figure, but not the profit ratio.

**5.** There was evidence to support the utilization of the $300 figure in the event sales were made.

stances they have already been sold by a dealer somewhere along the way. Some ships in the foreign service which make Philadelphia their first port of call want to wait until their last domestic port has been visited before buying cigarettes to take care of their foreign needs. Vessels which come into Philadelphia from a foreign port can, upon departure, switch to the coastal trade. Vessels in the coastal trade are not eligible to make sea stores purchases. Many vessels which come into the Port of Philadelphia buy through their own offices located in cities other than Philadelphia. American Lines, United States Lines, American Export Lines, American Pioneer Lines, American President Lines, Farrell Lines, Luckenbach, Moore-McCormick, Matson, Calmar, Waterman, Isthmian and Weyerhauser are all in this category. British vessels which enter the Port of Philadelphia are not prospective customers because under currency exchange regulations they must either buy cigarettes of British manufacture or purchase American cigarettes from outlets in the United Kingdom. All of these circumstances—substantiated by undisputed evidence—make worthless plaintiff's postulate that 3,262 vessels were available to it as potential buyers.

Plaintiff relies upon the testimony of Piranian to sustain its claim that it could have sold 50% of the so-called potential customers. Piranian had been selling in bond cigarettes in the Port of Philadelphia for seven years, first as an employee of M. J. Kelly Company, a ship's chandler, and later for his own company. Piranian testified on direct examination:

"Q. How many ships, in your judgment, could a responsible salesman contact during the course of a year? You may divide it in any way you wish, Mr. Piranian. A. For successful sales I would say that he should get orders for 10 vessels out of the 20 that he calls per day." [6]

Piranian, it is to be noted, was asked a general question—how many calls could a reliable salesman make? After answering "20", Piranian added that if the salesman were to be successful he should get orders from 10 (one-half) of the vessels he solicited. Piranian's answer is nothing more than an abstract statement of what a reliable salesman should do to be successful. Piranian did not purport to say that plaintiff's sales efforts would be successful or that plaintiff could reasonably be expected to sell 50% of the vessels which it solicited.

Nor could the jury logically infer that because a successful salesman could have sold one-half of the vessels he called upon, plaintiff could have done so. Plaintiff planned to have only one salesman—Sheridan. His only sales experience was in selling tea. At the time when plaintiff was organized he was tending a bar in the suburbs of Philadelphia. Neither Sheridan nor the other persons identified with plaintiff as stockholders, officers, directors or prospective employees (2 lawyers, 2 deputy United States Marshals, and a former schoolteacher) had any experience in the sale of ship stores.

The ability to speak foreign languages, Piranian testified, is helpful in selling cigarettes on board foreign vessels, for generally the steward is unable to understand English and it is necessary to speak with him in his own tongue. Piranian himself spoke German, Armenian, and a little Russian and Spanish. Other persons in his employ spoke Spanish, Japanese, Italian and a little French and Greek. Sheridan spoke nothing but English, and, so far as the record discloses, no one else connected with plaintiff spoke a foreign language.

Considering plaintiff's contemplated organization there is no rhyme or reason

6. This testimony, R. 1565, is the only evidence relied upon in Plaintiff's Brief Contra Defendants' Motions under Rule 50(b) for the claim that plaintiff could have sold 1,750 vessels. See Brief, p.

41. At the argument on March 25, 1960, plaintiff conceded that this testimony was the only specific basis for the 1,750 vessels figure (pp. 67–68).

to infer that because a successful sales-man should sell 50% of the vessels which he calls on, the plaintiff would have done so. For plaintiff to assert that notwith-standing its total inexperience in the sea stores business and the competition which it would have encountered from Lipschutz and from three other ship chandlers—M. J. Kelly Company, Baker, Carvel & Morrell, and Valetti & Bergen-dahl—it would have been able to sell in its first year of its operation virtually the same number of vessels which Lipschutz was able to sell after 50 years in the same port, is farfetched to say the least.[7] Pir-anian's testimony would have supplied the jury with no reasonable basis for in-ferring any such fact.

Piranian was not qualified to express an opinion about the number of vessels plaintiff might have sold even if he had purported to do so. Piranian had experi-ence in dealing only with foreign flag ves-sels. These were his specialty. He had sold only one American flag vessel. Yet American flag vessels comprised 40% of the foreign trade vessels which entered the Port of Philadelphia. The buying habits of American flag vessels are not the same as those carrying foreign flags. Seamen on foreign flag vessels prefer dif-ferent tobacco products than do seamen on American flag vessels. Moreover, it is unnecessary to board American vessels to sell them because companies which own them do the buying.

Viewing the evidence and the infer-ences reasonably deducible therefrom in the light most favorable to plaintiff, the jury had no evidence before it from which it could have properly found that plaintiff might reasonably have sold 1,750 vessels, or indeed any other number of vessels, if it had been in the ship stores business during the period for which damages are claimed.

(B) *Sales of $10,000 to Piranian.* None of the manufacturing defendants

sold Piranian their tobacco products. He sold the products of Brown and William-son, Larus Bros., Stefano Bros., United States Tobacco and some imported Ger-man, Italian and Greek cigarettes. When Piranian secured an order for products of the manufacturing defendants from a ship which would be in Philadelphia for more than two days, he would obtain the merchandise from a Baltimore distribu-tor. If the ship was not to be in the port for more than a day, he would turn the order over to Lipschutz. Piranian esti-mated that the business which he gave Lipschutz ran between $5,000 and $10,000 per year. Upon the basis of this testi-mony *alone* plaintiff contends that the jury might have inferred that if plain-tiff had been in business, it, and not Lip-schutz, would have been the recipient of orders for $10,000 from Piranian.

The evidence is undisputed that Pir-anian did not go into business for himself until 1958. This was after the present suit was begun. The date of institution of the action, the parties have agreed, is the terminal point for which damages can be claimed. Piranian's testimony as to the business which he gave Lipschutz after the end of the damage period pro-vides no proper basis for inferring that plaintiff might have received the same amount of business from Piranian during the damage period when Piranian was not even in business.

(C) *Profits of $18,000 on sales to Sea-farers' Sea Chest Corporation.* Seafar-ers' Sea Chest Corporation sells sea stores, including tobacco products, in all the major ports of the Atlantic and Gulf areas. Although it sells cigarettes of the major manufacturing companies, it is re-quired to purchase them from other dis-tributors due to its inability to buy di-rect.

Spivey, the president of Seafarers' Sea Chest Corporation, testified that if plain-tiff had been in business, his company

---

7. The same observation is pertinent to plaintiff's argument that Lipschutz' rec-ord in the Port of Philadelphia was a "raw fact" from which the jury could find that plaintiff would have been able to sell 1,-750 vessels. See argument March 25, 1960 at pp. 67–68.

would have purchased 9,000 cases of cigarettes from plaintiff during the damage period. Plaintiff assumes that it would have made $2 a case on these sales. This $2 figure includes a profit of $.50 per case plus a delivery allowance of $1.50 per case. The hypothesized profit of $.50 per case has evidentiary support, but plaintiff's assumption that it would have received $1.50 delivery allowance on cigarettes which it delivered to Seafarers' Sea Chest Corporation is groundless. It purports to rest upon the fact that Reynolds allowed Lipschutz $1.50 per case on deliveries in the Philadelphia area. There is no evidence that the 9,000 cases of cigarettes which plaintiff claims that Spivey would have bought would have been delivered in the Philadelphia area. Nor is there any basis for such an inference since in 1956 and 1957 it serviced only about 30 vessels in the Port of Philadelphia and these had purchased on the average only 6 cases of cigarettes. So far as the record discloses, Reynolds was the only company which granted the $2 delivery allowance even in the Philadelphia area, and there is no suggestion in the record that Spivey would limit his purchases from plaintiff to Reynolds' products.

Spivey's testimony was sufficient to support a finding that plaintiff would have made a gross profit of approximately $4,500 on sales to Seafarers' Sea Chest Corporation. This, of course, is substantially less than the $29,600 expenses of doing business which plaintiff asserts it would have been put to.

Wm. Goldman Theatres, Inc. v. Loew's, Inc., supra, is not a precedent for requiring jury submission of the damage question. There, the Court recognized that when a plaintiff has no established business showing the potentiality of profits, it will be difficult for him to prove profits with any degree of certainty. Despite this difficulty and the fact that Goldman had never operated a first-run theatre, the Court held that Goldman had been damaged by a conspiracy which prevented the Erlanger from opening as a first-run theatre. The Court pointed out that Goldman had successfully operated second-run theatres, that the owner of its stock was an experienced and successful motion picture operator who was thoroughly familiar with conditions in the business in Philadelphia, that the Erlanger was modern, handsomely appointed, fully equipped and ready to operate, and that Goldman had a top organization which needed only a comparatively few additional personnel. It was against this background that the Court found an evidentiary basis for estimating Goldman Theatre's probable profits. Although in doing so the Court relied in part upon the business which five first-run theatres in Philadelphia had done, its estimate was based in large measure upon the gross income of the Mastbaum during the first three months of its operation. The Court said that the Mastbaum was "directly comparable" to the Erlanger, that its conspicuous success immediately after its opening "throws a strong light upon the profit possibilities of the Erlanger" [69 F.Supp. 107] and that it would give "particular attention" to the record of the Mastbaum.

In the case at bar plaintiff's personnel had had no experience in the sea stores business, and there is no evidence of the sales of tobacco products by any newcomer in the sea stores field comparable to plaintiff. These circumstances alone make the Goldman case peculiarly inapplicable as a precedent.

Wholly apart from the evidence relating to the loss of specific items of profit, plaintiff asserts that the evidence in its "raw state" was sufficient to enable the jury to find that plaintiff was damaged and to estimate the amount. This expression is extracted from Rankin Co. v. Associated Bill Posters, 2 Cir., 1930, 42 F.2d 152, 156, where the Court sustained a jury verdict upon the basis of the plaintiff's historical earnings even though no estimate had been made of future earnings. Since plaintiff at bar had no historical earnings, there is no basis for applying the "raw state" of the evidence theory which Rankin Co. found to be appropriate.

Finally, plaintiff argues that since there is sufficient evidence to establish that plaintiff's inability to enter the sea stores business was due to defendants' conspiracy, defendants' motion for a directed verdict must be denied regardless of the insufficiency of evidence to establish damages. This is presumably on the theory that a conspiracy which keeps a person out of business is an invasion of that person's right to engage in business unimpeded by conspiratorial conduct and that damages may be inferred from an invasion of that right. 15 Am.Jur. Damages § 5. In these circumstances the right of a plaintiff in an anti-trust action to nominal damages is supported by statements in Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., supra, 166 F. at page 260, and United Exhibitors v. 20th Century Fox Film Distributing Corporation, D.C.W.D.Pa.1940, 31 F.Supp. 316, 317. More recent decisions, however, have held with unanimity that a pecuniary loss is essential to recovery in an anti-trust treble damage action. Hunter Douglas Corporation v. Lando Products, 9 Cir., 1956, 235 F.2d 631, 637–638; Burnham Chemical Co. v. Borax Consolidated, 9 Cir., 1948, 170 F.2d 569, 578; Wolfe v. National Lead Co., 9 Cir., 1955, 225 F.2d 427, 433; Turner Glass Corporation v. Hartford Empire Co., 7 Cir., 1949, 173 F.2d 49, 51, 52; Clark Oil Co. v. Phillips Petroleum Co., D.C.Minn.1944, 56 F.Supp. 569, 574, affirmed 8 Cir., 1945, 148 F.2d 580; certiorari denied 1945, 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437; Northwestern Oil Co. v. Socony Vacuum Oil Co., 7 Cir., 1943, 138 F.2d 967, 970–971. In dissenting in the Bigelow case for reasons not presently pertinent, Mr. Justice Frankfurter stated that "* * * Legal injury is not automatically established by proof of a restraint of trade in violation of the Sherman law." 327 U.S. 251, 267, 66 S.Ct. 574, 581.

Noerr Motor Freight v. Eastern Railway Presidents Conference, supra, is not at odds with the foregoing decisions. Although treble damages of 18 cents were awarded to some of the plaintiffs, it was after the Court had found that those plaintiffs had been actually damaged by conduct of the defendants. It was solely because the plaintiffs had stipulated to forego damages based on such conduct that nominal damages, trebled, were allowed. 155 F.Supp. 768, 835–836; 273 F.2d 218, 220–221.

Whenever a person has been deprived of the opportunity of carrying on a business of his choice by actions in derogation of the anti-trust laws, the courts have been understandably sympathetic to his plight. Since in such a case proof of damage is made more difficult by the action of the wrongdoers themselves, the Courts have recognized that essential concepts of fairness require the application of less exacting standards of proof than are normally demanded. This is, of course, as it should be. Wrongdoers should not be able to utilize their own wrong to insulate themselves against liability. But despite judicial liberality in accepting minimal proof of damage in an anti-trust case, the rule persists that any damage estimate by a jury must be "just and reasonable" and not based on "speculation or guesswork". Bigelow v. RKO Radio Pictures, supra, 327 U.S. at page 264, 66 S.Ct. at page 580. No damage verdict could be rendered upon the evidence in the present case without doing violence to this inexorable requirement.

During the argument plaintiff stated that if there was no evidence to sustain a damage verdict, no basis existed for injunctive relief and its case must fall. In view of this, the record will not be reviewed to determine whether there is enough evidence to support a finding of a conspiracy. In actions seeking treble damage and injunctive relief, other courts have refrained from passing on the evidentiary basis of a conspiracy charge when they have determined that insufficient evidence existed to support the treble damage claim. Wolfe v. National Lead Co., 9 Cir., 1955, 225 F.2d 427, 429; cf. Clark Oil Co. v. Phillips Petroleum Co., D.C.Minn.1944, 56 F. Supp. 569. Nor is it necessary to resolve

**450**

the additional grounds relied upon by Reynolds, Lorillard and the Estate of Albert Lipschutz.

The motion of all defendants for judgments in their favor will be entered.