Daniel B. DeGREGORIO, Pearl Gouedy, by Von Gouedy, guardian ad litem, on behalf of themselves and all others similarly situated, and Philadelphia Welfare Rights Organization, Plaintiffs,

v.

Stanley SEGAL, Individually and as administrator of the Ashton Hall Nursing Home, the Ashton Hall Nursing Home, Thomas Mignone, Individually and as administrator of the Chapel Manor Nursing and Convalescent Center, the Chapel Manor Nursing and Convalescent Center, Terry Thesieres, Individually and as administrator of the Haverford Nursing Home, the Haverford Nursing Home, Beverly Shenefelt, Individually and as administrator of the Mayo Nursing Home, the Mayo Nursing Home, on behalf of themselves and all others similarly situated, the Health Care Facilities Association of Pennsylvania (HCFAP), Walter Harrison, in his capacity as President of HCFAP, Gerald Specter, in his capacity as Executive Vice-President of HCFAP, Defendants.

Civ. A. No. 76–264.

United States District Court,
E. D. Pennsylvania.

Jan. 10, 1978.

Gilbert B. Abramson, Philadelphia, Pa., for Segal and Ashton Hall.

Benj. S. Ohrenstein, Bala Cynwyd, Pa., for Chapel Manor and Thomas Mignone.

Donald Brown, Nathan L. Posner, Philadelphia, Pa., for Mayo and Beverly Shenefelt.

Roger L. Mutzel, Media, Pa., for Thesieres and Haverford.

John Killian and Charles O. Barto, Jr., Harrisburg, Pa., for HCFAP, Harrison and Specter.

R. Michael Kemler, Ellen Josephson, Community Legal Services, Philadelphia, Pa., for plaintiffs.

## OPINION

DITTER, District Judge.

This anti-trust action for treble damages alleges that the owners of nursing home facilities have conspired to fix prices charged for the care of indigents.[1] Presently before the court are the defendants' motions to dismiss for lack of subject matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2] For the reasons which follow, these motions must be denied.

### 1. Factual Background

In this action, the two named plaintiffs and the Philadelphia Welfare Rights Organization (hereafter PWRO) purport to represent a class of all persons eligible for medical assistance in Pennsylvania who are

---

1. Plaintiffs also seek injunctive relief under 15 U.S.C. § 26 as well as compensatory and punitive damages for defendants' alleged tortious conduct.

2. Defendants Stanley Segal and Ashton Hall Nursing Home raise the subject matter jurisdiction question in conjunction with the alleged effect on interstate commerce. See Part 3 of this opinion. Defendants Terry Thesieres and Haverford Nursing Home have also grounded their motion to dismiss on plaintiffs' failure to join a party needed for just adjudication under F.R.Civ.P. 19, but they advance no argument in support of this claim. Therefore, the motion to dismiss on this basis must be denied. Motions for summary judgment and class action determination have also been filed, decisions on which await this opinion.

in need of skilled nursing facilities but who have been denied access to them. Defendants are four nursing homes; their administrators; the Health Care Facilities Association of Pennsylvania (hereafter HCFAP), which is a trade organization representing 215 non-profit, proprietary and governmental nursing homes; and two HCFAP officers. Plaintiffs allege that these defendants have conspired to fix the rates which the Commonwealth of Pennsylvania pays under the medical assistance program to skilled nursing facilities for providing care to indigent patients. Plaintiffs assert that defendants have conspired to deny such care as part of an effort to increase their prices, contending this activity constitutes per se violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, as well as common law tortious conduct.

Taking as true the allegations of the complaint and all reasonable inferences deducible therefrom, *Curtis v. Everette*, 489 F.2d 516, 518 (3d Cir. 1973), cert. denied 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974), the operative facts may be briefly stated. Under ordinary circumstances, a skilled nursing facility participating in the Pennsylvania Medical Assistance Program (hereafter Medicaid), 42 U.S.C. §§ 1396 et seq.; 62 P.S. §§ 441.1 et seq., enters into a contract with the Pennsylvania Department of Public Welfare, executing a "Skilled Nursing Home Care Agreement." This agreement obligates the facility to provide skilled nursing care to eligible medical assistance patients in return for which the facility receives reimbursement presently set at $20. per patient per day from the welfare department. At some unknown date prior to June 26, 1975, defendants began a series of discussions which culminated in a conspiracy to 1) have the rate of reimbursement raised to $27.25 per day; 2) boycott and refuse to accept any new Medicaid patients until this rate was increased, this boycott to begin on August 1, 1975; and 3) further

coerce the Commonwealth to increase the rate by threatening to terminate their provider agreements with the state. The culmination of this conspiracy occurred on June 26, 1975, when a HCFAP press release was issued, detailing the above-described action the defendants would undertake and its objectives (Complaint, paragraphs 32, 35; Exhibit II). In furtherance of this conspiracy, defendants refused to admit plaintiff DeGregorio, although he had been approved by the Medicaid program as eligible for skilled care and each of the homes had beds available for male patients. Mr. DeGregorio's sole source of income was and still is a monthly Social Security check of approximately $130. Plaintiff Gouedy was subjected to a similar concerted refusal of admission, although she also had been declared eligible for skilled care. Mrs. Gouedy's sole source of income also was a monthly Social Security check for $168.50.

Defendants' objections to the complaint are many, but basically they can be broken down into two main categories: standing and the sufficiency of the allegations of effect on interstate commerce. I shall consider them separately.

## 2. Standing

■ The threshold requirement of standing is statutory in antitrust cases.[3] An antitrust plaintiff has standing if he alleges a violation of the antitrust laws, demonstrates that he has suffered injury to his business or property, and shows that his injury was incurred "by reason of" the other party's illegal activities. These requirements are imposed because Congress did not intend, by enacting Section 4 of the Clayton Act, to "provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972). Rather, treble damage relief has

---

**3.** Section 4 of the Clayton Act, 15 U.S.C. § 15, which grants a right of relief to those aggrieved by a violation of the antitrust laws, provides in part:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . .

been confined, at least in the Third Circuit, "to those individuals whose protection is the fundamental purpose of the antitrust laws." *Cromar Co. v. Nuclear Materials and Equipment Corp.*, 543 F.2d 501, 505 (3d Cir. 1976), quoting *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 125 (9th Cir.), cert. denied sub. nom. *Morgan v. Automobile Mfgrs. Assn.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

■ At the outset, it is apparent that plaintiffs have sufficiently alleged a violation of the antitrust laws. Group boycotts, concerted refusals by competitors to deal with others, long have been held unreasonable or illegal per se under the federal antitrust laws, and beyond justification. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 545 (1958).[4] Trade associations must necessarily regulate the conduct of their members, but regulations or rules which require the members to refuse to deal should be upheld only if they are reasonable and not directed at specific individuals. *Radiant Burners, Inc. v. People's Gas, Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed. 358 (1961).

Here, defendants' policies were directed, by their very nature, against plaintiffs.[5] Therefore, plaintiffs have alleged an antitrust violation, and if they can demonstrate individual injury sustained by reason of the violation, they may maintain this suit.

a. *Daniel DeGregorio's Allegations of Injury Under Section 1.*

■ Mr. DeGregorio first alleges that he suffered a cognizable injury to his business in that defendants' act denied him the opportunity to be restored to employability. From early on, it has been recognized that the language "business interest" should be given a broad interpretation to accomplish the Act's objectives, *Quinonez v. Nat. Assn. of Securities Dealers, Inc.*, 540 F.2d 824 829 (5th Cir. 1976), that it "denotes the employment or occupation in which a person is engaged to procure a living." *Roseland v. Phister Mfg. Co.*, 125 F.2d 417, 419 (7th Cir. 1942). One who has lost the opportunity to perform work as the result of an antitrust violation has stated an injury to his business or property and is entitled to recovery, *Nichols v. Spencer International Press, Inc.*, 371 F.2d 332, 334 (7th Cir. 1967), and salaries or commissions lost as a result of antitrust practices are recoverable as well.

**4.** The judicial abhorrence to boycotts is best reflected in Justice Black's often quoted statement in *Northern Pacific R. Co.*, supra, 356 U.S. at 5, 78 S.Ct. at 518:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

**5.** The illegal per se rule does not apply solely to "competitors' " boycotts, i. e., boycotts directed against other traders.

. . . This contention [that the illegal per se rule applies solely to competitors] is refuted by the language of recent decisions of the Supreme Court and of this court in cases which held refusals of manufacturers or dealers to deal with customers to be per se violations of the Sherman Act [footnote omitted]. *Washington State Bowling Prop. Assn. v. Pacific Lanes, Inc.*, 356 F.2d 371, 376 (9th Cir.), cert. denied 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966).

This case is not unlike *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Kapp v. National Football League*, 390 F.Supp. 73 (N.D.Cal.1974); *Robertson v. National Basketball Association*, 389 F.Supp. 867 (S.D.N.Y.1975), and *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049 (C.D.Cal.1971), wherein individual professional athletes, obviously not in competition with their respective clubs or leagues, but nonetheless harmed by the boycott-type practices engaged in by the defendant organizations, were permitted to bring antitrust actions.

See also *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

*Vandervelde v. Put and Call Brokers and Dealers Assn.*, 344 F.Supp. 118 (S.D.N.Y. 1972). However, this does not mean that everyone can bring an action because he was denied the opportunity to enter a business. Numerous courts have rejected the idea that there need be an actual on going business to obtain standing, see, e. g. *Triangle Conduit & Cable Co. v. Nat. Electric Products Corp.*, 152 F.2d 398, 400 (3d Cir. 1945); *N.W. Controls, Inc. v. Outboard Marine Corp.*, 333 F.Supp. 493, 507 (D.Del. 1971); *Delaware Valley Marine Supply Co. v. American Tobacco Co.*, 184 F.Supp. 440, 443–4 (E.D.Pa.1960), aff'd 297 F.2d 199 (3d Cir. 1961), cert. denied 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962), but they have required at the very least that plaintiff demonstrate the intention and preparedness to enter the business. A simple hope or expectation to enter a business is insufficient.

■ Plaintiff DeGregorio has failed to allege that he is prepared to enter a business.[6] He argues that it would be superfluous and unjust to require him to show preparedness to be employed, because it is precisely plaintiff's preparedness to be employed that has been deprived by defendants' activities. I find this argument to be unacceptable. It is nothing more than a bootstrap attempt to alleviate the necessity of demonstrating that he has suffered some economic injury. Were I to follow this line of reasoning, then anyone denied skilled nursing care, no matter if that person was incapable of ever working again, could contend that he could possibly have been restored to employability and thus has suffered injury. The antitrust laws were not enacted to protect this type of person. Plaintiff has failed to demonstrate that the deprivation of such an elusive opportunity constitutes an injury to his business, and therefore he has no standing to sue on this basis.

■ Mr. DeGregorio's second assertion of injury to his business or property is that he was denied the benefit of two income exemptions to which he would have otherwise been entitled as a Medicaid patient had he been admitted to a skilled nursing care facility. I find this argument persuasive, and accordingly hold that he has standing to pursue his antitrust action on this ground.

By way of brief background: the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396g, is a cooperative program, whereby participating states reimburse qualified "providers" of services which also choose to participate. The Act requires that the participating states make services available to all individuals receiving cash assistance under one of the federally-aided public welfare programs.[7] These individuals are termed "categorically needy". 45 C.F.R. § 248.1(a)(1). In addition, the Act authorizes states to elect to make medical assistance available to individuals whose income and resources exceed the amount allowed to qualify them for cash assistance, but which are insufficient to meet the costs of necessary medical care and services. These individuals are termed "medically needy." 45 C.F.R. § 248.1(a)(2).[8]

---

**6.** Plaintiff does mention in his brief that he was a former employee of a Philadelphia restaurant and that, if restored to his former level of functioning, he would return to his work at the restaurant. Although this appears to fall short of an actual demonstration of intent to enter a business, I will accept it for this stage of the proceeding as sufficient.

**7.** These programs are Aid to Families with Dependent Children and Supplemental Security Income, made up of Aid to the Blind, Aid to the Disabled and Old Age Assistance Programs.

**8.** Section 1396a(a)(13)(B) also requires that participating states provide categorically needy persons with at least the first five services

listed in Section 1396d(a), which includes care in skilled nursing facilities for those 21 years of age or older. Section 1396a(13)(C) requires the states, with respect to the medically needy, to provide either these first five services or any seven of the 16 listed. Pennsylvania has chosen to provide the medically needy group with skilled nursing facility services.

In order to qualify as medically needy, an individual in Pennsylvania must comply with the standards promulgated by the state Department of Public Welfare, standards required under 45 C.F.R. § 248.3(c)(2), which measure the extent to which a person's medical expenses exceed his income and resources.

Normally, an individual who receives Social Security benefits and who requires some kind of skilled nursing care pays all of his benefits to the treating institution. This is true simply because of economics—the Social Security monthly payment is not enough to meet the cost of the care and his savings or his family must make up the difference. But those characterized as medically needy are entitled to the benefit of two income exemptions granted by the Department of Public Welfare, i. e., the individual is not required to pay out all of his income to the nursing facility. Specifically, the Department regulations provide for a total annual income exemption of $1,225. for a single adult which is applicable during the first six months of the individual's stay in a public medical institution or an intermediate care or private skilled nursing facility. In addition, a patient staying six months or more in such a facility receives a $25. monthly income exemption for personal care items. Pennsylvania Department of Public Welfare—Public Assistance Manual §§ 9223.31a, 9223.32a.[9]

As mentioned previously, plaintiff DeGregorio qualified as a medically needy individual. He desired placement in a skilled nursing facility. Had he been accepted, he would have had the benefit of these exemptions. Instead, he was required to gain admission at Riverview, the county nursing home for Philadelphia, occupy a non-skilled, residential care bed, and turn over to the home all of his income from Social Security as a condition of his retention there. See Amended Complaint, paragraph 28. Thus, as a result of defendants' alleged practices, Mr. DeGregorio has been deprived of income.

The questions remain whether this asserted injury is sufficient to satisfy the "injury to business or property" standard necessary to confer standing and that it was suffered by reason of defendants' activities. "Injury to business or property" has been construed by the Supreme Court to mean that a "person whose property is diminished by a payment of money wrongfully induced is injured in his property," *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed.2d 241 (1906); accord, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489–90, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231 (1968); and a consumer of service who has been illegally overcharged has been granted standing. *Hawaii v. Standard Oil Co.*, supra, 405 U.S. at 262–64, 92 S.Ct. at 891–92. Generally, this requires that plaintiff suffer a pecuniary loss in order to recover. See *Delaware Valley Marine Supply Co.*, supra, 184 F.Supp. at 449. This does not require, however, that a payment of money be made, for in *Congress Building Corp. v. Loew's Inc.*, 246 F.2d 587, 594 (7th Cir. 1957), the court held that a lessor's rights under a lease which could be sold or traded were within the term property and any impairment to the value of those rights constituted an injury. Even if a money payment were necessary, plaintiff has alleged that the denial of admission to a skilled nursing facility thereby required him to expend certain Social Security income he could have otherwise retained. This is clearly within the pecuniary loss and diminishment of property test contemplated in *Delaware Valley Marine Supply Co.*, supra, and one induced "by reason of" the alleged wrongful conduct. In this regard, given the directness of the relationship between plaintiff and defendants and the directness of injury, plaintiff also fits well within the guidelines of *Cromar*, supra, 543 F.2d at 505. For these reasons, I conclude that plaintiff has standing to bring his antitrust action.

### b. *Pearl Gouedy's Standing*

Since plaintiff Gouedy[10] has alleged also that she was deprived of the benefit of the

---

**9.** Effective October 2, 1976, these sections were amended to reflect the current amounts. 6 Pa.Bull. 2443–44, October 2, 1976; Exhibit III, Plaintiffs' Memorandum Contra Defendants' Motion to Dismiss. Prior to this date, a single adult was entitled to a $2,000. semi-annual exemption and $15. per month for personal items for each month thereafter.

**10.** Mrs. Gouedy died on February 25, 1976, approximately one month after the institution of this suit.

income exclusions and had been qualified as medically needy prior to her being denied admission to skilled nursing facilities,[11] it is apparent, for the same reasons as mentioned previously, that she suffered a cognizable injury under the antitrust laws and has standing to maintain this action.

### c. PWRO's[12] Standing to Bring Suit

PWRO contends that it has standing to maintain its antitrust action in that defendants' alleged activities operated to thwart its social purpose, i. e., defendants' refusal to admit medical assistance patients eligible for skilled nursing care "impairs PWRO's ability to improve the conditions of life for those who must rely upon public welfare programs, including medical assistance." Amended Complaint, paragraph 11. Defendants, on the other hand, assert that the emerging rule in antitrust actions is that an association lacks standing to bring suit on behalf of its members to recover for their injuries and argue that this injury, in any case, does not qualify as an injury to business or property which merits Sherman and Clayton Act protection. I conclude that it would be inappropriate to confer standing upon PWRO, but do so for reasoning which differs from that offered by defendants.

■ An association may obtain standing in either of two ways: it may have standing in its own right to seek relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy, *N A A C P v. Alabama,* 357 U.S.

449, 458–60, 78 S.Ct. 1163, 1169–71, 2 L.Ed.2d 1488 (1958), or it may have standing solely as the representative of its members even where it has suffered no injury from the challenged activity. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Philadelphia Welfare Rights Organization v. Embry,* 438 F.Supp. 434, 437 (E.D. Pa.1977). In the latter instance, the association must allege

> . . . that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit [citation omitted]. So long as this can be established, *and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensible to proper resolution of the cause,* the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction [emphasis added]. *Warth v. Seldin,* supra, 422 U.S. at 511, 95 S.Ct. at 2211–12.

■ The requisites to associational standing described above are not clearly present here. Although PWRO has adequately established that the interests it seeks to protect are germane to the organization's purpose, it has failed to demonstrate that *each* member would have standing or that individual participation would not be necessary.

**11.** Defendants contend that Pearl Gouedy lacks standing because she was not eligible for medical assistance at the relevant time. For support, they rely on a letter written by defense counsel stating that Mrs. Gouedy had not met the medical requirements for admission to a nursing facility because she had not visited her physician for the previous 18 months, contrary to certification requirements under Medicaid regulations, a proposition for which defendants cite no authority.

Of course, reliance on matters outside the pleadings require me to treat the motion as one for summary judgment under F.R.Civ.P. 56(b) and I shall treat the motions to dismiss Pearl Gouedy as such. Defendants' argument is insufficient to sustain a motion for summary judgment, simply because counsel's letter does not eliminate any genuine issue of fact. First, it only raises the possibility that Mrs. Gouedy visited another physician during this period. Second, the letter is based on hearsay; there is no supporting affidavit by the physician that this was what transpired. Finally, Exhibit I of plaintiff's memorandum plainly indicates that Mrs. Gouedy was deemed qualified for medical assistance, specifically nursing home care, on February 24, 1975, at least six months before she was denied admission to one of the defendants' facilities.

**12.** PWRO is an unincorporated association comprised of approximately 3500 individuals eligible for public and medical assistance. It exists for the purpose of advancing the rights of these individuals. Amended Complaint, paragraphs 7 and 8.

[W]hatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of the injury would require individualized proof. Thus, to obtain relief in damages, each member . . . who claims injury as a result of . . . [defendants'] practices must be a party to the suit, and . . . [PWRO] has no standing to claim damages on his behalf. *Id.* at 515–16, 95 S.Ct. at 2214.

Nor can PWRO maintain the suit in its own right. Its allegation that its social purposes were thwarted fails to satisfy a requirement of injury. Even if I were to conclude that this is a cognizable injury, it is apparent that any value to be assessed to the alleged interference would be far too speculative. There is nothing in the complaint upon which a finder of fact could rely in determining any basis for adequate compensation. For these reasons, I conclude that PWRO lacks standing to bring a Section 1 claim.

### d. *Plaintiffs' Standing Under Section 2*

Although the prior reasoning applies to plaintiffs' Section 1 cause of action, similar reasoning should apply to their Section 2 claims.

The offense of monopoly under Section 2 of the Act has two elements: 1) the possession of monopoly power in the market and 2) a specific intent to monopolize, as opposed to acquisition of monopoly power from product superiority, business acumen, or accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Defendants ground their motion to dismiss this claim on the basis that plaintiffs have failed to allege defendants' possession of monopoly power in the relevant market. In *United States v. E. I. DuPont deNemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), the Supreme Court defined monopoly power as "the power to control prices or exclude competition". It is true that plaintiffs did not use the specific language of Section 2. But a liberal construction of the allegations of plaintiffs' Amended Complaint, a construction I must undertake in antitrust cases, demonstrates that plaintiffs have adequately detailed the necessary elements to a Section 2 violation. In particular, the use of alleged boycott-type practices is a sufficient demonstration of the intent to monopolize, and the fact that HCFAP represents 215 facilities, many of which participate in the Medicaid program, reveals the potential to control prices or exclude competition in the program.[13]

13. PWRO is denied standing on this claim for the same reasons it does not have standing to bring a Section 1 claim.

Also at issue is plaintiffs' standing under Section 16 of the act; 15 U.S.C. § 26, which provides:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . .

Since the courts have exercised less restraint in granting standing under this section, *In Re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* supra, 481 F.2d at 130, and since plaintiffs DeGregorio and Gouedy have been granted standing under the more restrictive Section 4, it is clear they may maintain their action under Section 16 also. With respect to PWRO's claim for injunctive relief, the court in *Warth v. Seldin,* supra, elaborated on the type of relief that an association could pursue on its members' behalf:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. *If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.* Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind. [emphasis added]. 422 U.S. at 511, 95 S.Ct. at 2213.

In light of the allegations that PWRO members are being denied needed nursing facilities care which places their lives and health in serious jeopardy, the association has adequately asserted "injury to its members of sufficient immediacy and ripeness to warrant judicial intervention. *Id.* at 516, 95 S.Ct. at 2214. PWRO, therefore, has standing under Section 16.

### 3. The Effect on Interstate Commerce

Defendants also ask that plaintiffs' Sherman Act claims be dismissed on the ground that there are insufficient allegations of an effect on interstate commerce to confer subject matter jurisdiction on this court. The problem involved in such a determination was raised and addressed recently in *Mortensen v. First Federal Savings and Loan Association,* 549 F.2d 884 (3d Cir. 1977). Although the exhaustive analysis undertaken there need not be repeated, a reference to what the court said is necessary for an adequate consideration of defendants' motion.

 In Sections 1 and 2 of the Sherman Act,[14] the jurisdictional basis and an element of the violations are both found in the phrases: "in restraint of trade or commerce among the several States" and "any part of the trade or commerce among the several States," respectively. Because of the double role assigned to the interstate commerce nexus, confusion has resulted in how to treat motions to dismiss. Under a 12(b)(6), failure to state a claim motion, or under a 12(b)(1) motion that attacks the subject matter jurisdiction allegations of the complaint on its face, a plaintiff is entitled to have all of his allegations taken as true and a decision on defendants' motion involves only the legal sufficiency of the case plaintiff has pleaded. However, in a 12(b)(1) motion challenging jurisdiction on a factual basis, there is no presumption of truthfulness and the existence of disputed material facts will not preclude the court's evaluating the merits of the jurisdictional claims. The effect of this procedure on Sherman Act cases is unique. If a defendant advances a 12(b)(6) motion, or if he advances a 12(b)(1) facial attack, the trial court must test the sufficiency of the interstate allegations on the basis of the pleadings and the plaintiff will not be compelled to prove those allegations at a pre-trial stage. With a 12(b)(1) motion which attacks the factual existence of subject matter jurisdiction, however, a plaintiff must either prove his allegations or "stand by while the court evaluates those allegations in the same way a jury would evaluate that nexus as part of plaintiff's case on the merits, or as a court would in considering a summary judgment." *Mortensen,* supra, 549 F.2d at 891.

The Court of Appeals concluded that because the nexus plaintiffs would have to establish to succeed on the merits would be at least in part the same nexus necessary to survive a jurisdictional attack, less in the way of jurisdictional proof should be required at a pretrial stage. For support, the court examined the decisions of other circuits which had considered this question. The general consensus of these cases [15] was to disapprove dismissals at an early stage of the proceeding "unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent." *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Association,* 484 F.2d 751, 759 (7th Cir. 1973), cert. denied 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). Against this backdrop, the Third Circuit considered the Supreme Court's decision in *Hospital Building Co. v. Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), which overturned the Fourth Circuit's decision affirming a dismissal. There, the Supreme Court concluded that whether the motion for dismissal was under

---

14. Although Judge Hunter discussed only Section 1 of the Sherman Act in *Mortensen,* I find that the reasoning is equally persuasive as to Section 2.

15. *Battle v. Liberty Nat. Life Ins. Co.,* 493 F.2d 39, 47 (5th Cir. 1974), cert. denied 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Assoc.,* 484 F.2d 751, 759 (7th Cir. 1973), cert. denied 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); *McBeath v. Inter-American Citizens for Decency Committee,* 374 F.2d 359, 363 (5th Cir.), cert. denied 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967); cf. *Hospital Building Co. v. Rex Hospital,* 511 F.2d 678, 681 (4th Cir. 1975), rev'd 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The Ninth Circuit takes a different approach by separating the restraint by itself from the interstate effect of the restraint. See *Gough v. Rossmoor Corp.,* 487 F.2d 373, 376 (9th Cir. 1973); *Rasmussen v. American Dairy Assoc.,* 472 F.2d 517, 521 (9th Cir. 1972), cert. denied 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

12(b)(1) or 12(b)(6), "the critical inquiry is into the adequacy of the nexus between respondents' conduct and interstate commerce that is alleged in the ,complaint" and "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Id.* at 742 n. 1, 746, 96 S.Ct. at 1851, 1853.

With the proceeding in mind, I turn to plaintiffs' interstate commerce allegations. In order for these allegations to be sound, they must assert either activities that are in the flow of interstate commerce or activities which, although local, substantially affect interstate commerce. *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 51 (3d Cir. 1973). Here, the complaint alleges seven factors [16] which, plaintiffs claim, establish that this test has been met. While this number of factors seems minimal, I find that plaintiffs have sufficiently alleged defendants' conduct substantially affected interstate commerce. Accordingly, the complaint should not be dismissed for lack of subject matter jurisdiction.

The Supreme Court has had occasion to address the adequacy of interstate factors in two recent decisions. First, in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court found jurisdiction although the practices involved (legal services for procuring home mortgages) were performed totally intrastate. It did this by viewing the services as an integral part of the mortgages and concluding that the mortgages were interstate transactions; approximately half of them were granted by out-of-state lenders and many of the loans were insured by out-of-state agencies. Second, in *Hospital Building Co.,* supra, the court considered a number of interstate factors [17] and held that their combination established a sufficient effect on interstate commerce. Moreover, in *Mortensen,* supra, the Court of Appeals considered eight factors and, without placing emphasis on any one particular area, concluded that together they could withstand a pretrial jurisdictional attack.

Obviously, the number of allegations is not as important as their content and the Supreme Court has stopped far short of establishing a test delineating how many averments are required. Upon examination here, it is apparent that plaintiffs' allegations are, in reality, only three in number: 1) Pennsylvania, as a participating state, receives federal monies which flow in interstate commerce; 2) those nursing facilities participating in the Medicaid program therefore receive reimbursement in part from funds which flow in interstate commerce; and 3) defendants are dependent on goods and services which flow in interstate commerce. While these assertions do not approach the number of factors considered in the above-mentioned cases, both 1) and 2) do contain reference to federal funds, an allegation deemed important by the court in *Hospital Building Co.* Plaintiffs might be able to find more in the way of interstate commerce if permitted the opportunity of discovery. For these reasons, I find that plaintiffs' allegations are sufficient to survive defendants' motions to dismiss for lack of subject matter jurisdiction.

### 4. Conclusion

It must be remembered that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff would not be able to prove facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed. 80 (1957). This standard becomes even more

16. See Amended Complaint, paragraphs 40–46.

17. The Court pointed to 5 particular areas of alleged interstate commerce: 1) plaintiff purchased up to 80% of its medicines and supplies from out-of-state sellers; 2) a substantial number of patients came from outside the state; 3) a large proportion of plaintiff's revenue allegedly came from out-of-state insurance companies or from the Federal Government through the Medicare and Medicaid programs; 4) plaintiff paid a management fee based on gross receipts to its parent company, located out-of-state; and 5) plaintiff had developed plans to finance a multi-million dollars expansion through out-of-state lenders.

restrictive when the complaint at issue involves antitrust allegations. Guided by these principles, I conclude that the individual plaintiffs have adequately alleged an antitrust violation and an injury to their property which was incurred by reason of defendants' activities in order to permit them standing under Section 1 of the Sherman Act. These assertions are adequate also to enable them to maintain their Section 2 and Section 16 causes of action. But it is equally clear that plaintiff PWRO has failed to demonstrate a cognizable injury to the association itself or that it may represent its members with respect to the Section 1 and Section 2 claims for damages. With respect to the claim for injunctive relief, however, the association does have standing. Plaintiffs' allegations of nexus between defendants' conduct and interstate commerce are not many, but they are sufficient to establish that interstate commerce is substantially affected. For these reasons, defendants' motions to dismiss must be denied, except insofar as they relate to PWRO.